Markman, J.
This case presents the question of whether plaintiffs have standing to bring a suit on behalf of their members under the Michigan environ *611 mental protection act (MEPA), MCL 324.1701 et seq. We conclude that, under the particular circumstances of this case, plaintiffs have standing. We affirm the decision of the Court of Appeals and remand this case to the trial court for further proceedings.
I. BACKGROUND
Defendant Cleveland Cliffs Iron Company (Cleveland Cliffs), in partnership with defendant Empire Iron Mining Partnership, planned to expand operations at the Empire Mine in Michigan’s Upper Peninsula. Cleveland Cliffs applied for a permit through the Michigan Department of Environmental Quality (MDEQ), which held a public hearing to receive public comment. Eventually, the MDEQ issued the permit.
Plaintiffs, on behalf of their members, filed a petition for a contested case hearing with the MDEQ. The hearing referee held that plaintiffs lacked standing and dismissed the matter. Plaintiffs then appealed to the Marquette Circuit Court, which affirmed the referee’s dismissal, and the Court of Appeals denied plaintiffs’ application for leave to appeal.
Meanwhile, plaintiffs filed suit in Ingham Circuit Court (venue was later changed to Marquette County), including a count asserting a claim under MEPA.[1] Plaintiffs sought a temporary restraining order and a pre *612 liminary injunction of further mine expansion. The trial court denied the injunction, finding that plaintiffs lacked standing. Plaintiffs appealed, and the Court of Appeals reversed.[2] The Court analyzed the statute and found that it simply permitted “any person” to bring suit.
This Court granted leave, limited to the issue of “whether the Legislature can by statute confer standing on a party who does not satisfy the judicial test for standing. See Lee v Macomb Co Bd of Comm’rs, 464 Mich 726 [629 NW2d 900] (2001).”[3]
II. STANDARD OF REVIEW
Whether a party has standing is a question of law that we review de novo. Lee, supra at 734.
III. STANDING
First, contrary to the three concurring/dissenting opinions, one of which “disavows” its past support for Lee, supra, one of which reaffirms its past opposition to Lee, and one of which maintains its support for Lee while distinguishing it into nothingness, we reaffirm our support for the principles of standing set forth in Lee, and explain the importance of Lee for our constitutional system of separated powers and for the preservation of a judiciary operating within proper boundaries.[4]
*613 The Michigan Constitution provides that the Legislature is to exercise the “legislative power” of the state, Const 1963, art 4, § 1, the Governor is to exercise the “executive power,” Const 1963, art 5, § 1, and the judiciary is to exercise the “judicial power,” Const 1963, art 6, § 1. The importance of these allocations of power is reaffirmed in Const 1963, art 3, § 2, which states:
The powers of government are divided into three branches: legislative, executive and judicial. No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution.
By separating the powers of government, the framers of the Michigan Constitution sought to disperse governmental power and thereby to limit its exercise. “[T]here [is] no liberty... if the power of judging be not separated from the legislative and executive powers.” Madison, The Federalist No 47.[5]
As a term that both defines the role of the judicial branch and limits the role of the legislative and execu *614 tive branches, it is clear that the scope of the “judicial power” is a matter of considerable constitutional significance. Given the final authority of the judicial branch to accord meaning to the language of the constitution, the term “judicial power” cannot ultimately be defined by the Legislature any more than “unreasonable searches and seizures”[6] or the “equal protection of the laws”[7] can ultimately be defined by the Legislature.[8]
The “judicial power,” although not specifically defined in the Michigan Constitution, is distinct from both the legislative and executive powers. As former Justice Thomas Cooley has written:
It is the province of judicial power [] to decide private disputes between or concerning persons; but of legislative power to regulate public concerns, and to make law for the benefit and welfare of the state. [Cooley, A Treatise on the Constitutional Limitations (Little, Brown & Co, 1886) at 92.]
The “judicial power” has traditionally been defined by a combination of considerations: the existence of a real dispute, or case or controversy; the avoidance of deciding hypothetical questions; the plaintiff who has suffered real harm; the existence of genuinely adverse parties; the sufficient ripeness or maturity of a case; the eschewing of cases that are moot at any stage of their litigation; the ability to issue proper forms of effective relief to a party; the avoidance of political questions or other non-justiciable controversies; the avoidance of *615 unnecessary constitutional issues; and the emphasis upon proscriptive as opposed to prescriptive decision making.
Perhaps the most critical element of the “judicial power” has been its requirement of a genuine case or controversy between the parties, one in which there is a real, not a hypothetical, dispute, Muskrat v United States, 219 US 346; 31 S Ct 250; 55 L Ed 246 (1911), and one in which the plaintiff has suffered a “particularized” or personal injury. Massachusetts v Mellon, 262 US 447, 488; 43 S Ct 597; 67 L Ed 2d 1078 (1923). Such a “particularized” injury has generally required that a plaintiff must have suffered an injury distinct from that of the public generally. Id.
Absent a “particularized” injury, there would be little that would stand in the way of the judicial branch becoming intertwined in every matter of public debate. If a taxpayer, for example, opposed the closing of a tax “loophole” by the Legislature, the legislation might be challenged in court. If a taxpayer opposed an expenditure for a public building, that, too, might be challenged in court. If a citizen disagreed with the manner in which agriculture officials were administering farm programs, or transportation officials’ highway programs, or social services officials’ welfare programs, those might all be challenged in court. If a citizen opposed new prison disciplinary policies, that might be challenged in court.
In each instance, the result would be to have the judicial branch of government — the least politically accountable of the branches — deciding public policy, not in response to a real dispute in which a plaintiff had suffered a distinct and personal harm, but in response to a lawsuit from a citizen who had simply not prevailed in the representative processes of government. To allow the judiciary to carry out its responsibilities in this *616 manner is to misperceive the “judicial power,” and to establish the judicial branch as a forum for giving parties who were unsuccessful in the legislative and executive processes simply another chance to prevail. To allow this authority in the judiciary would also be to establish the judicial branch as first among equals, being permitted to monitor and supervise the other branches, and effectively possessing a generalized commission to evaluate and second-guess the wisdom of their policies. As the United States Supreme Court observed in Mellon-.
The administration of any statute... is essentially a matter of public and not of individual concern.. .. The party who invokes the [judicial] power must be able to show not only that the statute is invalid but that he has sustained or is immediately in danger of sustaining some direct injury as the result of its enforcement, and not merely that he suffers in some indefinite way in common with the people generally. ... To [allow standing under a different understanding] would be not to decide a judicial controversy, but to assume a position of authority over the governmental acts of another and co-equal department, an authority which we plainly do not possess. [Id. at 487-489.]
When a broadening and redefinition of the “judicial power” comes not from the judiciary itself, usurping a power that does not belong to it, but from the Legislature purporting to confer new powers upon the judiciary, the exercise of such power is no less improper. The acceptance by one branch of the expansion of the powers of another branch is not dispositive in whether a constitutional power has been properly exercised. When the Legislature redefines the “judicial power” by expanding the realm of disputes cognizable by the judiciary, such expanded power on the part of the courts invariably comes at the expense of the executive, whose policies then become subject to the perpetual review *617 and revision of the courts. As the United States Supreme Court observed in Lujan v Defenders of Wildlife, 504 US 555, 576-577; 112 S Ct 2130; 119 L Ed 2d 351 (1992):
Vindicating the public interest (including the public interest in Government observance of the Constitution and laws) is the function of the Congress and the Chief Executive. ... To permit Congress to convert the undifferentiated public interest in executive officers’ compliance with the law into an “individual right” vindicable in the courts is to permit Congress to transfer from the President to the courts the Chief Executive’s most important constitutional duty, to “take Care that the Laws be faithfully executed,” Art II, § 3. It would enable the courts, with the permission of Congress, “to assume a position of authority over the governmental acts of another and co-equal department,” and to become “virtually continuing monitors of the wisdom and soundness of Executive action. We have always rejected that vision of our role .... [Citations omitted; emphasis in original.]
“We must as judges recall that, as Mr. Justice Holmes wisely observed, the other branches of Government ‘are ultimate guardians of the liberties and welfare of the people in quite as great a degree as the courts.’ ” Flast v Cohen, 392 US 83, 131; 88 S Ct 1942; 20 L Ed 2d 947 (1968) (Harlan, J., dissenting), quoting Missouri, Kansas & Texas R Co v May, 194 US 267, 270; 24 S Ct 638; 48 L Ed 971 (1904).
Despite the remarkable statement in Justice WEAVER’S concurrence/dissent, post at 654, that the majority “expands the power of the judiciary,” the exact opposite is true. By its adherence to Lee, the majority opinion rejects a constitutional regime in which the judicial branch can be invested with extra-constitutional powers at the expense of the other branches, in particular the executive. One need only be a casual student of *618 government to recognize the extraordinary rarity of an institution of government, such as this Court, choosing, on the basis of constitutional objection, not to exercise a power conferred upon it by another branch of government. It is impenetrable reasoning to equate such an abnegation of power with an enhancement of power.
The requirement of a genuine case or controversy as a precondition for the exercise of the “judicial power” is not a mere fine point of constitutional law. Rather, as Professor Alexander Bickel once wrote:
[There are] sound reasons, grounded not only in theory but in the judicial experience of centuries, here and elsewhere, for believing that the hard, confining, and yet enlarging context of a real controversy leads to sounder and more enduring judgments. [Bickel, The Least Dangerous Branch (2d ed) (Yale University Press, 1986) at 115.]
Professor Bickel proceeded to observe that a contrary result in Mellon — one failing to recognize the importance of a plaintiff having suffered an “immediate, personal injury” in order to have standing to bring a lawsuit — would have “materially altered the function of judicial review and seriously undermined any acceptable justifications for it.” Id. at 122.[9] Justice Robert Jackson has similarly written that the case or contro *619 versy requirement of the federal constitution is “perhaps the most significant limitation upon judicial power.” The Role of the Supreme Court in the American System of Government (Harvard University Press, 1955) at 101. And Justice Antonin Scalia has observed:
The Judiciary would be, “from the nature of its functions, .. . the [department] least dangerous to the political rights of the constitution,” not because its acts were subject to legislative correction, but because the binding effect of its acts was limited to particular cases and controversies. [Plaut v Spendthrift Farms, 514 US 211, 223; 115 S Ct 1447; 131 L Ed 2d 328 (1995), quoting Hamilton, The Federalist, No 78.]
The concurrence/dissents, stating that they would overrule Lee, would erode one of the most significant barriers protecting the people from government by the judiciary. As Justice Harlan warned in his dissent in Flast, supra at 130, “There is every reason to fear that unrestricted public actions might well alter the allocation of authority among the three branches of the Federal Government.” In United States v Richardson, 418 US 166, 188; 94 S Ct 2940; 41 L Ed 2d 678 (1974), Justice Powell observed, “[r]elaxation of standing requirements is directly related to the expansion of judicial power . . . significantly altering] the allocation of power at the national level, with a shift away from a democratic form of government.” And in Lewis v Casey, 518 US 343, 349-350; 116 S Ct 2174; 135 L Ed 2d 606 (1996), the Supreme Court opined:
It is the role of courts to provide relief to claimants ... who have suffered, or will imminently suffer, actual harm; it is not the role of courts, but that of the political branches, to shape the institutions of government in such fashion as *620 to comply with the laws and the Constitution.... [T]he distinction between the two roles would be obliterated if, to invoke intervention of the courts, no actual or imminent harm were needed, but merely the status of being subject to a governmental institution that was not organized or managed properly.
When courts exceed the “judicial power,” the interests of some other branch of government necessarily must be implicated and, as already observed, these normally will be the interests of the executive branch. As then-Professor, later-Justice Scalia put it:
[T]he law of standing roughly restricts courts to their traditional undemocratic role of protecting individuals and minorities against impositions of majorities, and excludes them from the even more undemocratic role of prescribing how the other two branches should function in order to serve the interests of the majority itself. [Scalia, The doctrine of standing as an essential element of the separation of powers, 17 Suffolk U L Rev 881, 894 (1983).]
Professor Kenneth Karst has described some of the practical implications of relaxing the case or controversy requirement in greater detail:
These developments in jurisdictional doctrine are representative of the emergence of what Abram Chayes has called “public law” litigation. In the traditional common-law model of a lawsuit there is one plaintiff and one defendant; the plaintiff personally initiates the lawsuit, and on both sides the parties control the conduct of the case; the parties’ dispute concerns legal obligations founded on facts in the past; the remedies requested are closely fitted to the specific rights of the plaintiff; and the case culminates in a single trial and a single judgment. If, however, a class of plaintiffs sues a governmental institution such as a school board or the managers of a state hospital or prison, the lawsuit is likely to diverge from the common-law model. Public interest lawyers may invent the lawsuit and then go out to find some plaintiffs.... The *621 whole process has a “legislative” or even “administrative” look. The interests of the particular parties in whose name the suit was filed seem secondary. [Oxford Companion to the Supreme Court, supra at 458-459.]
In this process, the authority of the executive branch is replaced by the authority of the judiciary, public policy decisions increasingly come to be made exclusively by lawyers in robes, the negotiation and compromise and give-and-take of the representative processes is replaced by the absolutist “rights” analyses of individual judges, and local control of public decision making comes increasingly to be replaced by unaccountable judicial decision making. One committed to a governmental system in which most important public policy decisions are eventually made by the courts, and in which the representative processes increasingly become little more than a prelude to judicial decision making, would, almost certainly, begin by dismantling longstanding and traditional preconditions to the exercise of the “judicial power” reflected in the concept of standing.[10]
Thus, we continue to adhere to Lee, and conclude that Lee was correct in its holding that questions of standing implicate the constitutional separation of powers, and that forsaking this proposition “would imperil the constitutional architecture . . ..” Id. at 735. As the United States Supreme Court observed in Allen v Wright, 468 US 737, 751-752; 104 S Ct 3315; 82 L Ed 2d 556 (1984):
*622 The requirement of standing... has a core component derived directly from the Constitution.
[T]he law of Art. Ill standing is built on a single basic idea — the idea of separation of powers... . [Q]uestions . .. relevant to the standing inquiry must be answered by reference to the Art. Ill notion that federal courts may exercise power only “in the last resort, and as a necessity,” and only when adjudication is “consistent with a system of separated powers and [the dispute is one] traditionally thought to be capable of resolution through the judicial process.” [Quoting Chicago & Grand Trunk R Co v Wellman, 143 US 339, 345; 12 S Ct 400; 36 L Ed 176 (1892), and Flast, supra at 97.]
See also Lujan, supra at 561.
If the Legislature were permitted at its discretion to confer jurisdiction upon this Court unmoored from any genuine case or controversy, this Court would be transformed in character and empowered to decide matters that have historically been within the purview of the Governor and the executive branch. If there is dispute over the manner in which the Governor is enforcing or administering a law, such dispute, in the normal course, must be resolved through the executive process. If there are citizens who believe the Governor is wrongfully or inadequately enforcing or administering the state’s consumer protection or occupational safety or worker’s compensation or revenue laws, it is their right to petition or lobby the Governor in order to alter these policies. It is also the right of such citizens to petition or lobby the Legislature in order to cause them to alter these laws. Finally, of course, it is the right of citizens to participate in the channels of public debate, and in the political processes, in order to influence public policies, or to place in public office persons who are more *623 accommodating to their points of view. Unless there is an individual who has personally been injured by the Governor’s enforcement or administration of these laws, it is not normally the role of the judicial branch to monitor the work of the executive and determine whether it is carrying out its responsibilities in an acceptable fashion. That the Legislature — perhaps even with the acquiescence of the executive — has purported to impose this role upon the judicial branch does not alter this constitutional reality. See, e.g., Hayburn’s Case, 2 US (2 Dall) 409; 1 L Ed 436 (1792), in which the United States Supreme Court refused to accept as part of its “judicial power” the responsibility imposed upon it by the Congress of examining the pension claims of Revolutionary War veterans. The Court concluded that the Congress could not “constitutionally assign to the Judiciary any duties, but such as are properly judicial, and to be performed in a judicial manner,” id. at 410; see also Osborn v Bank of United States, 22 US (9 Wheat) 738; 6 L Ed 204 (1824).[11]
*624 Justice WEAVER’S efforts to distinguish between the United States and the Michigan constitutions in defining the “judicial power” are unconvincing. She misapprehends both of these constitutions.
In the first section of the judicial articles of the federal and the Michigan constitutions, their respective judicial branches are vested simply with the “judicial power.” The federal constitution states, “The judicial Power of the United States shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish.” US Const, art III, § 1. The Michigan Constitution states, “The judicial power of the state is vested exclusively in one court of justice .. ..” Const 1963, art 6, § 1. The purpose of these sections is to define — equivalently to what has been done earlier in the first sections of the legislative and executive articles — the scope of authority of the judicial branch. That authority consists exclusively of the “judicial power.”
Nothing further is said in either of these constitutions specifically defining the “judicial power,” with three exceptions in the Michigan Constitution, each of which undercuts the argument of the concurrence/ dissents that there is no fixed meaning to the “judicial power” and that it is susceptible to constant redefinition at the discretion of the other branches.[12] Const *625 1963, art 3, § 8 allows either house of the Legislature to request the Court to issue an “advisory opinion” on the “constitutionality of legislation”; Const 1963, art 9, § 32 confers upon “any taxpayer of the state” standing to bring suit to enforce the provisions of the so-called Headlee Amendment; and Const 1963, art 11, § 5 empowers “any citizen of the state” to bring injunctive or mandamus proceedings to enforce the civil service laws of the state. To the extent that the people of Michigan, through their Constitution, have chosen to confer upon the judiciary three specific authorities potentially beyond the traditional “judicial power,” it seems unlikely that the people intended that any other such nontraditional authority could simply be incorporated as part of the “judicial power” by a simple majority of the Legislature.[13]
The concurrence/dissents find relevant that the federal constitution diverges from the Michigan Constitution where, in art III, § 2, it states:
The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority; — to all Cases affecting Ambassadors, other public Ministers and Consuls; — to all Cases of admiralty and maritime Jurisdiction; — to Controversies to which the United States shall be a Party; — to Controversies between two or more States; — between a State and Citi *626 zens of another State; — between Citizens of different States; — between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign states, Citizens or Subjects. [Emphasis added.][14]
Contrary to what is implicit in the concurrence/dissents, this is not a definitional provision that seeks to give meaning to the “judicial power.” Rather, art III, § 2 is a provision defining the limited judicial power of the federal judiciary, in contrast to the plenary judicial power of the state judiciary. The respective legislative articles of the two constitutions are analogous to the judicial articles: the legislative article of the Michigan Constitution does not purport to define the authority of its Legislature (for example, nothing is said therein concerning its authority over marriage, divorce, child custody, child support, alimony, or foster care), while the legislative article of the federal constitution does affirmatively confer authority upon the Congress, article I, § 8. The state judicial power, as with the state legislative power, is plenary, requiring no affirmative grant of authority in the state Constitution. The federal judicial power, on the other hand, as with the federal legislative power, is limited. Such power is exclusively a function, or a creation, of the federal constitution, and, therefore, must be affirmatively set forth. In similar fashion, the federal judicial power must also be affirmatively set forth, for it is also a function, or creation, of the federal constitution. Thus, US Const, art III, § 2 does not define the “judicial power”; rather it defines what part of the “judicial power” within the United States belongs to the federal judiciary, with the remaining part belonging exclusively *627 to the state judiciary. That art III, § 2 variously employs the terms “cases” or “controversies” is not to confer a particular meaning upon the “judicial power,” but merely is to employ words that are necessary to the syntax of allocating the “judicial power” between the federal and state governments.[15] The concurrence/ dissents would confuse the allocation of a power with its definition, and would thereby define the federal “judicial power” in the narrowest possible manner by limiting it through reference alone to the existence of a “case.”[16] Even from the perspective of the concurrence/ dissents, is there no more permanent aspect of the “judicial power” than that it pertain to a “case“?
In fact, the “judicial power” in the Michigan Constitution, with the several exceptions enumerated above, is the same “judicial power” as in the federal constitution,[17] and it is the same “judicial power” that has *628 informed the practice of both federal and state judiciaries for centuries.[18] These historical principles were recognized by Lee, and we continue to adhere to them today.[19]
At the same time that the concurring/dissenting justices extol their own commitment to preservation of the natural environment, they might well devote equal attention to the preservation of our constitutional environment. By their diminishment of a traditional check and balance upon the exercise of the “judicial power,” the concurring/dissenting justices would, if their position were ever to gain a majority, inflict considerable injury upon our system of separation of powers and the rule of law that it has produced.
IV APPLICATION
At a minimum, standing consists of three elements:
First, the plaintiff must have suffered an “injury in fact” — an invasion of a legally protected interest which is (a) concrete and particularized, and (b) “actual or imminent, not ‘conjectural’ or ‘hypothetical.’ ” Second, there must be a causal connection between the injury and the *629 conduct complained of — the injury has to be “fairly... traceable to the challenged action of the defendant, and not... the result [of] the independent action of some third party not before the court.” Third, it must be “likely,” as opposed to merely “speculative,” that the injury will be “redressed by a favorable decision.” [Lee, supra at 739, quoting Lujan, supra at 560-561.]
Plaintiffs seek injunctive relief on behalf of their members. Nonprofit organizations, such as plaintiffs, have standing to bring suit in the interest of their members where such members would have standing as individual plaintiffs. See, generally, Trout Unlimited, Muskegon White River Chapter v White Cloud, 195 Mich App 343, 348; 489 NW2d 188 (1992); Karrip v Cannon Twp, 115 Mich App 726, 733; 321 NW2d 690 (1982). Thus, plaintiffs must allege that their members suffered either an actual injury or an “imminent” injury. Lee, supra at 739-740, citing Lujan, supra. The United States Supreme Court in Friends of the Earth, Inc v Laidlaw Environmental Services (TOC), Inc, 528 US 167, 183; 120 S Ct 693; 145 L Ed 2d 610 (2000), found “environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons ‘for whom the aesthetic and recreational values of the area will be lessened’ by the challenged activity” (citation omitted). The Court continued, contrasting the allegations with those found insufficient in Lujan and Los Angeles v Lyons, 461 US 95; 103 S Ct 1660; 75 L Ed 2d 675 (1983) (regarding anticipated use of chokeholds by the LAPD):
[W]e see nothing “improbable” about the proposition that a company’s continuous and pervasive illegal discharges of pollutants into a river would cause nearby residents to curtail their recreational use of that waterway and would subject them to other economic and aesthetic harms. The proposition is entirely reasonable, the District *630 Court found it was true in this case, and that is enough for injury in fact. [Friends of the Earth, Inc, supra at 184-185 (emphasis added).]
Plaintiffs here provided affidavits from three individuals, members of their organizations who reside near the mine, who alleged they bird-watched, canoed, bicycled, hiked, skied, fished, and farmed in the area, they plan to continue to do so as long as the area remains unspoiled, and they are “concerned” that the mine expansion will irreparably harm their recreational and aesthetic enjoyment of the area. One affiant also alleged that his well, on property adjacent to the mine, was almost dry and he had to construct a new, deeper well due to the local aquifer dropping too low. He alleged this was because of defendants’ mining activities. These affidavits are nearly identical to those found adequate in Laidlaw, and we find they sufficiently meet the test for standing we set forth in Lee.
However, we note that plaintiffs may not simply rely on these affidavits throughout the entire proceedings to prove that standing exists. Subject-matter jurisdiction is a matter that may be raised at any time. MCR 2.116(D)(3). The United States Supreme Court explained the requirements in Lujan, supra at 561:
The party invoking federal jurisdiction bears the burden of establishing these elements [i.e., injury in fact, causation, redressibility]. Since they are not mere pleading requirements but rather an indispensable part of the plaintiffs case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation. At the pleading stage, general factual allegations of injury resulting from the defendant’s conduct may suffice, for on a motion to dismiss we “presume that general allegations embrace those specific facts that are necessary to support *631 the claim.” In response to a summary judgment motion, however, the plaintiff can no longer rest on such “mere allegations,” but must “set forth” by affidavit or other evidence “specific facts,” which for purposes of the summary judgment motion will be taken to be true. And at the final stage, those facts (if controverted) must be “supported adequately by the evidence adduced at trial.” [Citations omitted.]
Thus, a plaintiff must include in the pleadings “general factual allegations” that injury will result from the defendant’s conduct. If the defendant brings a motion for summary disposition, the plaintiff must further support the allegations of injury with documentation, just as he has to support the other allegations that make up his claim. Finally, when the matter comes to trial, the plaintiff must sufficiently support his claim, including allegations of injury, to meet his burden of proof.[20]
In this case, the response to defendants’ motion is met by the affidavit of plaintiffs expert, Christopher Grobbel. Included in that document is an explanation of the expected effect on groundwater flow and recharge rate; effects on stream flow and water quality; and the expected effects on birds, fish, and plants resulting from the planned extensive habitat destruction. Grobbel’s affidavit serves to provide the necessary factual support for the individuals’ averred injuries. Plaintiffs will, of course, be required at trial to meet their burden of proof regarding the alleged injuries and the alleged effects of the expansion plans.
*632 Because we hold that plaintiffs have standing without regard to MCL 324.1701(1), we find it unnecessary to reach the constitutionality of § 1701(1).
V RESPONSE TO CONCURRENCE/DISSENTS
Justice WEAVER expresses dissatisfaction with the fact that plaintiffs have been found by the majority to possess standing to pursue their MEPA claims, but not on the constitutional grounds that she would prefer. It seems that it is not enough that plaintiffs prevail, but that their victory must be predicated, not upon the resolution of a mere case or controversy, but upon the constitution itself. The majority concludes that it is unnecessary in this case to resolve a constitutional issue where the case can be fully resolved on nonconstitutional grounds. Just as respect for the requirements of standing is an essential element of the responsible exercise of the “judicial power,” so too is respect for the need to address constitutional issues only where necessary. Given her very different views of standing, it is understandable why Justice WEAVER, unlike this majority, would find the constitutional question here to be an easy one. However, notwithstanding the merits of our respective views on standing, constitutional issues— whether easy or difficult — are to be avoided where a case can be resolved adequately on non-constitutional grounds.[21]
*633 Several other aspects of Justice WEAVER’S opinion deserve comment, as does the opinion of Justice KELLY:
(1) Justice WEAVER asserts that, despite Lee, Michigan’s standing requirement is not constitutional, but rather is nothing more than “judge-made” law. Post at 653 n 4.[22] It is hard to know what to make of this dismissive observation. Justice WEAVER does not explain why Lee constitutes “judge-made” law any more than any other interpretation of the constitution, except that she disagrees with Lee. Whatever “judge-made” law is, Lee does not constitute “judge-made” law any more *634 than Marbury v Madison, 5 US (1 Cranch) 137; 2 L Ed 60 (1803); McCulloch v Maryland, 17 US 316; 5 L Ed 579 (1819), or Brown v Bd of Ed, 347 US 483; 74 S Ct 686; 98 L Ed 2d 873 (1954). Some judicial opinions interpreting the Constitution, of course, may be more persuasive than others, but all are presumed to articulate the meaning of the Constitution rather than the personal views of a judge. In Lee, this Court, expounding upon the constitutional status of standing in Michigan, relied upon federal and state judicial precedents, as well as historical understandings, and in the instant opinion, we elaborate upon this analysis by looking to the meaning of the “judicial power” under the constitution. While Justice WEAVER is certainly free to disagree with the majority’s analysis, and while there is room for reasonable debate, the majority’s constitutional holding is no more properly characterized as “judge-made” law than any other interpretation of the constitution. What constitutes the “judicial power,” just as what constitutes “equal protection of the laws,” “due process,” and “cruel and unusual punishment,” cannot be determined by some mechanical process, but must be given meaning by judges attempting in good faith to understand the intentions of those who ratified these provisions. If constitutional interpretations with which she disagrees are mere “judge-made” law, how would Justice WEAVER characterize interpretations with which she agrees, perhaps even those interpretations produced by her own pen?
(2) Justice WEAVER asserts that the majority discussion of standing is, by virtue of Const 1963, art 4, § 52, “irrelevant to the important questions of Michigan law presented in this case.” Post at 651 n 1. Art 4, § 52 states, in part, “The legislature shall provide for the protection of the air, water and other natural resources of the state from pollution, impairment and destruc *635 tion.” Justice WEAVER contends that, pursuant to this provision, “the people of Michigan have required that the Legislature provide for the protection of Michigan’s natural resources. The Legislature properly acted in fulfillment of its constitutional responsibility through enactment of the MEPA citizen-suit provision . . . ,” and thus any constitutional standing concerns are irrelevant where MEPA is concerned. Post at 651-652.
What Justice WEAVER overlooks, however, is that there are many requirements that are imposed upon the Legislature by the constitution. For example:
— The Legislature “shall implement” legislation protecting civil rights. Const 1963, art 1, § 2.
— The Legislature “shall enact” laws to preserve the integrity of elections. Const 1963, art 2, § 4.
— The Legislature “shall implement” the rules of initiatives and referendums in Michigan. Const 1963, art 2, §9.
— The Legislature “shall further implement” rules against conflicts-of-interests by legislators. Const 1963, art 4, § 10.
— The Legislature “shall implement” the provisions of the Headlee Amendment pertaining to tax limitations. Const 1963, art 9, § 34.[23]
While undoubtedly making clear what some of the priorities and obligations of government are, these constitutional provisions do not state that the Legislature may pursue these goals, as Justice WEAVER implies, by whatever means. Rather, it is implicit in these provisions that the Legislature is to pursue these goals by appropriate means. The Legislature cannot pursue the objects of these “shall do” provisions by methods that *636 are otherwise unconstitutional. Does Justice WEAVER think that the Legislature is empowered under art 4, § 52 to do anything at all so long as it is done ostensibly with the goal of protecting the environment? Can it disregard due process in the criminal prosecution of environmental polluters? Can it disregard the requirements of just compensation in taking property in order to construct a wilderness area? Can it ignore the prohibition against ex post facto laws by criminalizing conduct that was legal at the time it took place?
Moreover, can the Legislature, under art 1, § 2 (requiring it to implement civil rights laws), expand the “judicial power” by enacting laws allowing “any person” to sue for a civil rights violation committed against “any other person,” even if the actual victim chooses not to sue? Can the Legislature, under art 9, § 34 (requiring it to implement tax-limitation provisions), expand the “judicial power” by authorizing “any person” in Monroe or Hillsdale to sue to prevent a tax increase in Marquette or Escanaba? Can the Legislature, under art 2, § 4 (requiring it to enact election laws), expand the “judicial power” by authorizing “any person” in Kalamazoo or Battle Creek to sue over ballot disagreements in the Alpena city council race?
While clearly identifying an important priority of government, art 4, § 52 does not authorize the Legislature to ignore all other provisions of the constitution in enacting laws to protect the environment. At least to date, the “judicial power” in Michigan has been exercised only on behalf of plaintiffs who have suffered actual and particularized injuries.
(3) Justice WEAVER repeatedly asserts that this Court, in exercising the “judicial power,” must act in conformity with MEPA. Post at 653, 654, 666. In this assertion, *637 she fundamentally misapprehends the duties of the judicial branch. As the Michigan Constitution makes clear, the duty of the judiciary is to exercise the “judicial power,” art 6, § 1, and, in so doing, to respect the separation of powers, art 3, § 2. While as a general proposition, the proper exercise of the “judicial power” will obligate the judiciary to give faithful effect to the words of the Legislature — for it is the latter that exercises the “legislative power,” not the judiciary— such effect cannot properly be given when to do so would contravene the constitution itself. Just as the judicial branch owes deference to the legislative branch when the “legislative power” is being exercised, so too does the legislative branch owe deference to the judicial branch when the exercise of the “judicial power” is implicated. Even with the acquiescence of the legislative and executive branches, the judicial branch cannot arrogate to itself governmental authority that is beyond the scope of the “judicial power” under the constitution. See Marbury v Madison, supra. The “textual” approach of the concurring/dissenting justice is a caricatured textualism, in which the Legislature is empowered to act beyond its authority in conferring powers upon other branches that are also beyond their authority.[24]
In the final analysis, the constitutional responsibility of the judiciary is to act in accordance with the constitution and its system of separated powers, by exercising the judicial power and only the judicial power.[25]
*638 (4) Justice WEAVER asserts that the majority’s decision “overrules 30 years of Michigan case law that held that the Legislature meant what it said when it allowed ‘any person’ to bring an action in circuit court to protect natural resources from actual or likely harm.” Post at 652. In support of this proposition, she cites Eyde v Michigan, 393 Mich 453, 454; 225 NW2d 1 (1975), and Ray v Mason Co Drain Comm’r, 393 Mich 294, 305; 224 NW2d 883 (1975). However, neither of these decisions, issued in the aftermath of MEPA’S passage, offer the slightest support for the concurrence/dissent’s conclusion. Unlike the present case, neither Eyde nor Ray concerned the issue of standing and neither involved plaintiffs concerning whom there was any question of standing. Rather, in Eyde and Ray, this Court did nothing more than describe, in passing, the substance of the various provisions of the new act. Such statements do not even rise to the level of dictum since in neither Eyde nor Ray did this Court even purport to comment upon the propriety of the standing provision, much less comment upon it approvingly. The statements in Eyde and Ray make no pretense of being statements of law; they are merely passing, but accurate, descriptions of what was contained in the new act. Because of what these statements constituted — mere *639 descriptions of provisions of an act not then in dispute — it is understandable why neither Eyde nor Ray set forth any analysis of the meaning of these provisions, any analysis of their constitutional implications, any analysis of relevant judicial precedents, and even any acknowledgment of relevant judicial precedents. See Smith v Globe Life Ins Co, 460 Mich 446, 461 n 7; 597 NW2d 28 (1999).[26] Yet, it is on the basis of Eyde and Ray that Justice WEAVER identifies “30 years of Michigan case law” in support of the proposition that matters of standing do not implicate the Constitution.[27]
(5) Justice WEAVER accuses the majority of “expanding] the power of the judiciary at the expense of the Legislature....” Post at 654. This accusation turns reality upon its head. It is akin to saying that President Washington was expanding his own powers by turning down congressional invitations to become King. Rather than expanding its powers, this Court, by questioning the authority of the Legislature to confer broader powers upon it, and thereby to expand the “judicial power,” is resisting an expansion of power — not an everyday occurrence in the annals of modern government.
By ensuring that the “judicial power” not be improperly expanded by the Legislature, and the “executive *640 power” not be improperly contracted, this Court is defending the constitutional structure. In similar fashion, the United States Supreme Court in Marbury v Madison, supra, concluded that a congressional grant of authority to the Court to issue writs of mandamus could not be exercised because the constitution did not allow the original jurisdiction of that Court to be expanded by mere statute. As Chief Justice Marshall stated, “It is a proposition too plain to be contested, that the constitution controls any legislative act repugnant to it.” Id. at 177. The Michigan Constitution grants this Court the “judicial power” — nothing more and nothing less — and neither the Legislature nor this Court itself possess the authority to redefine these limits.[28]
*641 (6) In attempting to understand Justice KELLY’S opinion, it is important to recognize that she takes great care to proclaim, post at 676 n 1, that, despite all contrary appearances, she is not “en toto” overruling Lee. The effect of this analysis on the part of the concurring justice is to allow her to enjoy the freedom to discard traditional principles of standing when it is useful to do so, as in this case, and then to reassert such principles, per Lee, when that is equally useful. The concurring justice’s decisionmaking is standardless and inconsistent with a predictable rule of law.[29]
(7) Justice KELLY sets forth a torrent of novel constitutional propositions in her opinion whose principal purpose apparently is to justify the abandonment of traditional principles of standing (“to open wide the courthouse doors”) — at least in the realm of environmental law. The people will have to wait to see whether the concurring justice is as amenable to the abolition of standing in other areas of the law. A few of the more creative propositions of constitutional law that inhabit her opinion:
— The “judicial power,” although it may require an individualized injury in order to bring a federal lawsuit, does not require the same to bring a state lawsuit. Post at *642 683. Although Justice Kelly correctly remarks upon the differing nature of the federal and state governments, she fails to demonstrate why these differences have any relevance at all for her conclusion that the “judicial power” should be understood differently within these systems.
— The subject-matter jurisdiction of state courts is “plenary,” and, therefore, the state “judicial power” is “plenary.” Post at 683. That there may be plenary state authority “to address any social problem that threatens the public welfare” does not mean that the “judicial power” encompasses all such authority. Id. at 683.
— The “people” only have the power to “execute” the environmental laws when they are permitted to sue in court. Post at 679. One might have thought that it was the executive branch’s responsibility to “execute” the laws, and that they did so on behalf of the “people.”
— The gist of the separation of powers principle, rather than to limit the exercise of governmental power by allocating specific responsibilities among the three branches of government, is to ensure that “one individual may not simultaneously hold office in more than one branch of government.” Post at 681 n 6. Thereby, the concurring justice would transform one of the pillars of our system of limited, constitutional government into the trivial (albeit probably correct) proposition that a legislator cannot at the same time serve as Director of the Department of Community Health.
— The Michigan Constitution allows the “judicial power” to be exercised over all “disputes,” and not merely “cases” or “controversies.” Post at 685-686. Aside from the fact that the concurring justice affords absolutely no guidance on what constitutes a “dispute” or how it differs from a “case” or “controversy” — although clearly it does, in her mind — she invokes no constitutional language, no constitutional history and no constitutional precedent for this blithe assertion. Indeed, in view of the fact that the *643 Constitution apparently does not address standing at all from her perspective, why is even so much as a “dispute” required?
— An effective substitute for the doctrine of standing are the doctrines of ripeness and mootness. Post at 686.
— The state “judicial power” is different in kind from the federal “judicial power” because the latter alone applies to federal questions and diversity cases. Post at 684. This is simply one more non sequitur in the concurring opinion in search of relevance.
— Federal and state standing requirements are a function of the methods by which judges are selected in these systems. Post at 684. “Everything considered, it is not surprising that the qualifications for standing in state courts are broader than in federal courts.” Id. at 684. We are aware of nothing in their method of selection that justifies state judges in exercising the “judicial power” according to different rules and constraints than federal judges.
— This Court, although it is barred from viewing standing as an issue of constitutional dimension, may nonetheless, in the face of a contrary legislative provision, “constrain its own power and limit standing . .. Post at 689. That is, a court may not countermand the words of the Legislature on the basis of the constitution, but it may do so on the basis of its own discretion as to when words should be ignored.
— An institution of government is “ill-advised to curb its [own] authority under the guise of respect for another branch of government.” Post at 689. “Ill-advised,” perhaps, in an era in which governmental institutions are expected to accrete as much power as possible; not so “ill-advised” if their premise is to act within the scope of their constitutional charter.
— Separation of powers principles “require” that the judiciary “respect” the Legislature’s decision. Post at 689. True, although only up to a point. At least since Marbury v *644 Madison anyway, the judiciary is also “required” to “respect” the constitution’s decisions.
(8) Justice KELLY argues that the separation of powers provision of the Michigan Constitution should not be read in an “overly rigid” fashion. This is essentially a euphemism for the proposition that this provision should not be read to mean very much of anything at all. It is hardly an “overly rigid” reading to suggest that, “[n]o person exercising powers of one branch shall exercise powers properly belonging to another branch” in art 3, § 2 means that a judge is limited to exercising the “judicial power,” and not the powers of another branch. This is made explicit in art 6, § 1.[30]
Moreover, Justice KELLY’S understanding of the separation of powers is confused, as reflected in her citation of the dissenting opinions in Judicial Attorneys Ass’n v Michigan, 459 Mich 291, 307; 586 NW2d 894 (1998); 228 Mich App 386, 427; 579 NW2d 378 (1998), for the proposition that the “separation of powers doctrine allows limited overlap and interaction between the branches.” Post at 682. Of course, in pursuit of their distinct constitutional powers, it will often be the case that the exercise of separated powers overlaps. For example, it may be that the Legislature in exercising its legislative power to enact laws and appropriate monies will sometimes come into conflict with the Governor in exercising her executive power to recommend or veto laws and appropriations. Although the separated powers of the legislative and executive branches do not overlap, their exercise often does. The separate and distinct *645 constitutional powers of two branches may be focused on the same subject areas and the operations of state government may occasionally involve a blending of governmental operations as, for example, in the interaction between the legislative and executive branches regarding the drafting of a law or the preparation of a budget. But this is distinct from a blending of powers or functions. However much cooperation there is between the branches, the Legislature exercises only the legislative power and the executive exercises only the executive power. While the exercise of such separated powers may often overlap — this being understood generally as the realm of checks and balances — there is no “sharing” of the legislative or executive powers. There is only a sharing of the sum of all state governmental power.
(9) Justice KELLY makes much of the concepts of citizen suits and private attorneys general, yet fails to note that the history of such suits indicates that they have been brought only by individuals who have suffered an injury. This understanding continues today.
Justice KELLY correctly notes that “citizen suits” have a long pedigree in English history through relator and informers’ actions. She fails to explain, however, that those who brought such actions were not strangers to the action, but possessed standing themselves either through a direct injury or through the assignation of the government’s injury in fact. The historical use of such actions was explained by the United States Supreme Court in Vermont Agency of Natural Resources v United States ex rel Stevens, 529 US 765, 774-777; 120 S Ct 1858; 146 L Ed 2d 836 (2000), using the label “qui tam” actions:
Qui tam actions appear to have originated around the end of the 13th century, when private individuals who had suffered injury began bringing actions in the royal courts *646 on both their own and the Crown’s behalf. See, e.g., Prior of Lewes v. De Holt (1300), reprinted in 48 Selden Society 198 (1931). Suit in this dual capacity was a device for getting their private claims into the respected royal courts, which generally entertained only matters involving the Crown’s interests. See Milsom, Trespass from Henry III to Edward III, Part III: More Special Writs and Conclusions, 74 L. Q. Rev 561, 585 (1958). Starting in the 14th century, as the royal courts began to extend jurisdiction to suits involving wholly private wrongs, the common-law qui tarn action gradually fell into disuse, although it seems to have remained technically available for several centuries. See 2 W Hawkins, Pleas of the Crown 369 (8th ed. 1824).
At about the same time, however, Parliament began enacting statutes that explicitly provided for qui tam suits [which] allowed injured parties to sue in vindication of their own interests (as well as the Crown’s), see, e.g., Statute Providing a Remedy for Him Who Is Wrongfully Pursued in the Court of Admiralty, 2 Hen. IV, ch. 11 (1400). [Emphasis added.]
Accordingly, the Court held that one who brings a relator suit has standing because he is the assignee of a claim and may assert the injury-in-fact suffered by the assignor, which is normally the government. Id. at 773. In such cases, the Court concluded, the government’s injury-in-fact suffices to confer standing on the individual relators bringing the suit. Id. at 774.
Similarly, a review of modern citizen suit cases almost always includes a review of standing in addition to a review of the statute that confers the right to such suits. See, e.g., Gwaltney of Smithfield, Ltd v Chesapeake Bay Foundation, 484 US 49, 65-66; 108 S Ct 376; 98 L Ed 2d 306 (1987). Further, like citizen suits, suits by private attorneys general do not involve those completely divorced from an injury; rather, they involve those who have suffered an injury — generally “noneconomic” injuries — and who have been provided an incen *647 tive by the legislature to bring a lawsuit to advance the public interest. See Middlesex Co Sewerage Authority v Nat’l Sea Clammers Ass’n, 453 US 1, 17; 101 S Ct 2615; 69 L Ed 2d 435 (1981). As the United States Supreme Court noted, the point of the doctrine is that “directly injured victims can be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely.” Holmes v Securities Investor Protection Corp, 503 US 258, 269-270; 112 S Ct 1311; 117 L Ed 2d 532 (1992) (emphasis added).
Therefore, contrary to Justice KELLY’S assertions, the use of citizen suits or actions by private attorneys general does not undermine the application of traditional standing requirements. If anything, the use of such suits supports the application of those requirements, as citizen suits and actions by private attorneys general have always been grounded in a private injury, whether suffered directly or as a result of an assignment by another.
(10) Justice WEAVER, referencing this Court’s decision in Preserve the Dunes v Dep’t of Environmental Quality, 471 Mich 508; 684 NW2d 847 (2004), derides the majority for having “unleashed an assault on MEPA this term.” Post at 674 n 31.[31] However, the legal issue addressed in Preserve the Dunes has utterly nothing in common with the legal issue addressed in this decision, and to rhetorically equate these decisions merely *648 because they both implicate an environmental statute suggests less a legal analysis on the part of the concurring/dissenting justice than a political statement. It is this Court’s responsibility simply to uphold the law and the constitution, not to promote or impede any particular legislative cause or interest, however popular or unpopular. Rather, the obligation of this Court is simply to say what the law is. And that is exactly what the justices in the majority have sought to do in this case, as they have each sought to do — however imperfectly — in every case coming before this Court.
The majority cannot read the concurring/dissenting justice’s conflation of wholly unrelated legal issues in a single derisive volley as anything other than implying that this Court has some obligation to decide environmental issues with an eye toward their results.[32] However, that the issue of standing has arisen here in the context of MEPA is, from the perspective of the majority, utterly irrelevant. The majority would be addressing this critical constitutional issue in identical terms if it had arisen in any other subject area of the law, and it would be no more of an “assault upon MEPA” than the present decision is an “assault upon MEPA.”
Further, in the other case referenced, Preserve the Dunes, in which this same majority has also allegedly “assaulted MEPA,” this Court addressed the following specific legal question — whether MEPA authorizes a collateral action to challenge the Department of Environmental Quality’s decision to issue a permit under the Sand Dune Mining Act, MCL 324.63701, enacted by the *649 Legislature, where that collateral action seeks to challenge flaws in the permitting process unrelated to whether the conduct involved has polluted, or will likely pollute, natural resources. We can only invite the reader of the instant opinion to also read Preserve the Dunes to determine whether that opinion represents an “assault on MEPA,” or instead an honest and impartial effort to resolve the limited question of statutory interpretation presented in that case.
Justice WEAVER’S “assault on MEPA” rhetoric becomes even more groundless when one recognizes that she is dissatisfied with the majority for having concluded that it is unnecessary to interpret MEPA at all in resolving the present standing controversy. Instead, we conclude that plaintiffs possess standing on traditional grounds. Thus, in the end, the majority’s “assault upon MEPA” amounts merely to the majority refraining from interpreting MEPA.[33]
VI. CONCLUSION
In addressing an issue that the majority does not resolve today, Justices WEAVER and KELLY would allow the Legislature to grant plaintiffs standing in environmental lawsuits, regardless of whether any injury has been suffered. Under this view of the “judicial power,” “any person,” for example, could seek to enjoin “any person” from mowing his lawn with a gas-powered mower because such activity allegedly creates air pollution and uses fossil fuels when other alternatives are available. “Any person” could sue “any person” for using too much fertilizer on his property, or allowing too *650 much runoff from a feedlot on his property. “Any person” could sue “any person” from using excessive amounts of pesticides in his home or garden or farm. “Any person” could sue “any person” for improperly disposing of used petroleum-based oils. “Any person” could sue “any person” for improper backyard grilling practices, excessive use of aerosol sprays and propellants, or wasteful lawn watering.[34]
We can only assume that the concurring/dissenting justices’ casualness about eliminating traditional rules of standing suggests that they are not fully aware of the world that they would create. It is a world in which any conduct allegedly affecting the environment might result in litigation if anyone, anywhere, for any reason, felt aggrieved. The potential for abuse under such a circumstance explains at least one of the practical reasons why the enforcement of regulatory laws has generally been limited to officers of the executive branch, and why, from time immemorial, standing has required an individualized injury on the part of a plaintiff. The concurring/dissenting justices would replace the judgment and discretion of the executive branch with an enhanced regime of lawsuits, a regime in which judges increasingly substitute their own views for those of the Governor, the Attorney General, and their appointees.
*651 This Court reaffirms Lee and concludes that, under the circumstances of this case, plaintiffs, on behalf of their members, possess standing to pursue the instant cause of action. Thus, we affirm the decision of the Court of Appeals and remand to the trial court for proceedings consistent with this opinion.
Corrigan, C.J., and Taylor and Young, JJ., concurred with Markman, J.

 MCL 324.1701(1) provides:
The attorney general or any person may maintain an action in the circuit court having jurisdiction where the alleged violation occurred or is likely to occur for declaratory and equitable relief against any person for the protection of the air, water, and other natural resources and the public trust in these resources from pollution, impairment, or destruction.
MCL 324.1704(1) provides:
*612 The court may grant temporary and permanent equitable relief or may impose conditions on the defendant that are required to protect the air, water, and other natural resources or the public trust in these resources from pollution, impairment, or destruction.

 Nat’l Wildlife Federation v Cleveland Cliffs Iron Co, unpublished memorandum opinion, issued June 11, 2002 (Docket No. 232706).

 468 Mich 944 (2003).

 Justice Weaver’s concurrence/dissent views the majority’s ultimate determination concerning whether plaintiffs possess standing as a fore *613 gone conclusion in light of the majority’s continued support for Lee. It is wrong in this assertion. In fact, we agree with the United States Supreme Court in Lujan v Defenders of Wildlife, 504 US 555, 578; 112 S Ct 2130; 119 L Ed 2d 351 (1992), which, although holding, as Lee does, that standing is of constitutional dimension, proceeds to observe that “[n]othing in this contradicts the principle that ‘the ... injury required by Art. Ill may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing.’ ” This is affirmed in the concurring opinion of Justice Kennedy, joined by Justice Souter, in which they similarly observe, “Congress has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before, and we do not read the Court’s opinion to suggest a contrary view.” Id. at 580.

 The separation of powers provision in each of Michigan’s Constitutions is “in harmony with American political theory, the State government [being] divided into the three historic departments, the legislative, executive, and judicial....” Schwartz v Flint, 426 Mich 295; 395 NW2d 678 (1986) (citation omitted).

 Const 1963, art 1, § 11.

 Const 1963, art 1, § 2.

 In short, the deference that the concurrence/dissents purport to give to the Legislature is misplaced for the deference owed by this Court must first he to the constitution and only then to the coordinate branches of our state government.

 Professor Kenneth Karst has written in the Oxford Companion to the Supreme Court (Oxford University, 1992), “By tying the courts’ power of constitutional interpretation to their power to decide cases, Marshall founded the legitimacy of judicial review on its connection to that case-deciding function.” Id. at 458. Professor Karst writes further:
In general, when governmental officials act, only someone who is personally injured by those acts has standing to complain that they are unlawful. Generally, a plaintiff does not satisfy the requirement of standing by alleging that governmental action was unconstitutional, if the only harm alleged has been caused by someone else, or if the illegality in question is only a violation of some other person’s legal right, [id.]
*619 See also Lujan, supra at 562.

 “This explicit requirement [of a case or controversy] is the constitutional key to understanding the forms and limits of judicial power.” McDowell, Curbing the Courts (Louisiana State Press, 1988) at 195. Standing was restricted to certain forms “so as not to allow the judges a ‘roving commission to do good.’ ” Id. at 172.

 Almost certainly, the analyses of the concurrence/dissents invite further efforts to redefine the “judicial power” in questionable ways. See, e.g., Plaut v Spendthrift Farms, supra, in which the Congress sought to require the Supreme Court to retroactively reopen final judgments, judgments that were apparently unpopular with the Congress. Two justices, Stevens and Ginsburg, in dissent indicated their willingness to accept this modified conception of the “judicial power.” “We must remember that the machinery of government would not work if it were not allowed a little play in its joints.” Id. at 266 (Stevens, J., dissenting), quoting Bain Peanut Co v Pinson, 282 US 499, 501; 51 S Ct 228; 75 L Ed 482 (1931). Nor, when the “judicial power” becomes a mere function of legislative determination, is there any guarantee that this authority will only be broadened. The concurrence/dissents have no principled way of addressing efforts by the legislative branch to contract, rather than to expand, the “judicial power.” In this regard, see the brief amicus curiae of Joseph L. Sax at 9 in which Professor Sax appears to argue that Const 1963, art 6, § 13, conferring jurisdiction upon the circuit courts “in accordance with rules of the Supreme Court,” enables this Court to *624 confer jurisdiction upon the circuit court through our rules without regard to the boundaries of the “judicial power.”

 If the “judicial power” can be redefined at the behest of the legislative or executive branches, one wonders why, under the analyses of the concurrence/dissents, it cannot also be redefined at the behest of the judicial branch itself, for why should that branch alone be disabled in its ability to give new meaning to this constitutional term? There is no principled reason from the perspective of the concurrence/dissents why a court could not expand upon its own authority by disregarding traditional restraints upon the exercise of the “judicial power.” By transform *625 ing the “judicial power” from a concept of constitutional stature into a mere prudential concept, to be decided absent any readily discernible standards, the concurrence/dissents would give considerable impetus to a more powerful judicial branch at the expense of coordinate branches of government.

 Justice Kelly interprets these provisions, conferring broader-than-traditional standing in specific areas of the law, as conferring broader-than-traditional standing in any area of the law in which the Legislature chooses to confer such standing. Post at 680 n 5. The majority draws exactly the opposite inference from these provisions.

 Although it is not relevant to the instant analysis, several of these provisions have been subsequently rendered effectively null and void by the Eleventh Amendment.

 “In the Constitution of the United States, we perceive, not the express creation of a judicial power, hut the recognition of it as a necessary part of the government.. . .” Rawle, A View of the Constitution of the United States (Nicken, Philadelphia, 1829) ch 21, pp 199-200.

 Although Madison suggested at the constitutional convention that the federal “judicial power” ought to be “limited to cases of a Judiciary Nature,” II Farrand, Records of the Federal Convention of 1787 (Yale University, 1966) at 430, there is remarkably little discussion in the Federalist Papers, the records of the convention, or in other constitutional source materials concerning the precise meaning of the “judicial power.” Similarly, there is virtually no discussion concerning the meaning of this term in the “Official Record” of the Michigan constitutional convention of 1961, or in source materials surrounding Michigan’s earlier constitutions. We attribute this to the fact that the term was sufficiently well understood by scholars, lawyers, judges, and even laymen of the time as not to require further elucidation. No one would have understood the “judicial power” to constitute an essentially empty constitutional vessel into which majorities of the Legislature were free to pour in novel meanings.

 In accord, Daniels v People, 6 Mich 381, 388 (1859); Sutherland v Governor, 29 Mich 320, 324 (1874); Risser v Hoyt, 53 Mich 185, 193; 18 *628 NW 611 (1884); Johnson v Kramer Bros Freight Lines, Inc, 357 Mich 254, 258; 98 NW2d 586 (1959); House Speaker v State Admin Bd, 441 Mich 547, 554; 495 NW2d 539 (1993), all cited in Lee, supra at 738.

 One constitutional framer observed, “The third great division of the powers of government is the judicial authority.. . . The judicial authority consists in applying, according to the principles of right and justice, the constitution and laws to facts and transactions in cases, in which the manner or principles of this application are disputed by the parties interested in them.” James Wilson, 1 Lectures on Law, pp 296-297 (1791).

 With all due respect, Justice Weaver, post at 653, 656, is breathtakingly mistaken in peremptorily describing as a “judge-made standing test” an element of the “judicial power” that would have been viewed by the framers of both the federal and the Michigan constitutions as essential to the separation of powers, itself perhaps the most essential pillar of our constitutional structure.

 It was with regard to these last two steps that Justices Scalia and Thomas dissented from the majority in Laidlaw. They would have found that although “[g]eneral allegations of injury may suffice at the pleading stage, ... at summary judgment plaintiffs must set forth ‘specific facts’ to support their claims.” Friends of the Earth, Inc, supra at 198.

 As Justice Cooley has remarked:
While the courts cannot shun the discussion of constitutional questions when fairly presented, they will not go out of their way to find such topics. They will not seek to draw in such weighty matters collaterally, nor on trivial occasions. It is both more proper and more respectful to a coordinate department to discuss constitutional questions only when that is the very Us mota. Thus presented and determined, the decision carries a weight with it to *633 which no extra-judicial disquisition is entitled. In any case, therefore, where a constitutional questions is raised, though it may be legitimately presented by the record, yet if the record also presents some other and clear ground upon which the court may rest its judgment, and thereby render the constitutional question immaterial to the case, the court will take that course, and leave the question of constitutional power to be passed upon when a case arises which cannot be otherwise disposed of, and which consequently renders a decision upon such question necessary. [Constitutional Limitations, ch 7, § 2 (1868) (citations omitted).]
See also Weimer v Bunbury, 30 Mich 201, 218 (1874); People v Quider, 172 Mich 280, 289; 137 NW 546 (1912); J & J Constr Co v Bricklayers & Allied Craftsmen, 468 Mich 722, 733-734; 664 NW2d 728 (2003). Justice WEAVER characterizes judicial restraint of the type described by Justice COOLEY, and honored by judges from time immemorial, as “dodging” the issue. Post at 672.

 It is difficult to reconcile Justice Weaver’s position that there is no constitutional limitation on what constitutes the “judicial power” with her concurring statement in In re Certified Question (Kenneth Henes v Continental Biomass Industries, Inc), 468 Mich 109, 121; 659 NW2d 597 (2003), in which she asserts that she would decline to answer a certified question presented in that case because the court rule pertaining to certified questions “represents an unconstitutional expansion of judicial power.” (Emphasis added.) She further observed in Certified Question that, “it is proper to examine the common-law understanding of ‘judicial power’ in order to determine ... the scope of that power .... ‘[Jjudicial power’ is ‘the power to hear and determine controversies between adverse parties, and questions in litigation.’ ” (Citations omitted). On this basis, she then concludes that the court rule is unconstitutional.

 See also Const 1963, art 2, § 1; art 4, §§ 12, 15, 51, 53; art 5, §§ 10, 12, 14, 15, 17, 18, 20; art 6, § 25; art 7; §§ 20, 21, 28; art 8, §§ 2, 4, 7, 9; art 9, §§ 1, 3, 5, 21, 35, 35a; art 10, § 5.

 One assumes, for/ example, that the concurring/dissenting justice would recognize the impropriety of the Legislature purporting to confer authority upon the executive branch to exercise the “executive power” to condemn property for a “non-public” use, see Wayne Co v Hathcock, 471 Mich 445; 684 NW2d 765 (2004), or of the Legislature purporting to exercise the “legislative power” by pardoning criminals.

 The concurring/dissenting justice’s repeated references to the “people’s mandate” (or the “will of the people”) in mepa, must, of course, be *638 read in connection with the ultimate “people’s mandate,” which is that found in their constitution. There, “we the people” have created for themselves a government in which, in at least four separate provisions, they have set forth as clearly as possible that the boundaries of governmental power are to be taken seriously. Const 1963, art 3, § 2; art 4, § 1; art 5, § 1; art 6, § 1.
Further, the concurring/dissenting justice seems considerably less enthusiastic about deferring to the “people’s mandate” in the context of the Sand Dune Mining Act, see infra at 52-54; Preserve the Dunes v Dep’t of Environmental Quality, 471 Mich 508, 530-532; 684 NW2d 847 (2004), in which the “people,” through their Legislature, have also determined that limited mining should be permitted near Michigan’s sand dunes.

 It is for these same reasons that we find unpersuasive the additional cases cited by Justice Weaver in support of her assertion that the majority is overruling “30 years of Michigan case law” concerning standing under mepa. Post at 652 n 3.

 Other references by the concurring/dissenting justice to Michigan case law are equally unavailing in support of this conclusion. In Detroit Fire Fighters Ass’n v Detroit, 449 Mich 629, 643; 537 NW2d 436 (1995) (Riley, J., concurring), for example, only a single justice of this Court, in pure dictum, indicated support for the proposition that Michigan standing requirements are based on prudential rather than constitutional concerns. Post at 658. House Speaker, supra at 554, is similarly inapt.

 In at least one respect — in her observation that “judicial activism can be disguised as judicial restraint,” post at 674 — we agree with the concurring/dissenting justice. Employing the language of judicial restraint, she would summarily jettison in the name of an (understandably) popular cause one of the most enduring bulwarks against judicial activism, the requirement of standing — the requirement that courts decide only actual cases and controversies between real parties with genuinely adverse interests. By dismantling this historical constraint upon the courts, she would allow the judicial branch — the least accountable and least representative branch of government — to become potentially involved in a sharply expanded range of public policy disputes. To many Americans of a wide range of political and jurisprudential views, this would exacerbate the recent trend in which the constitutional equilibrium between the judiciary, and the other branches of government, has become increasingly imbalanced and distorted in favor of the former.
The majority would restrict the judiciary to its traditional role of resolving actual cases and controversies. The concurring/dissenting justice potentially would allow any person opposed to some aspect of governmental policy, i.e., most persons, to sue in order to substitute then-personal preferences of what governmental policy ought to be for the policies actually produced by the representative processes of government. The concurring/dissenting justice would take advantage of the relative lack of public understanding of how traditional standing precepts maintain the constitutional separation of powers to self-characterize her position as one of “judicial restraint,” notwithstanding her support for eliminating one of the fundamental underpinnings of genuine judicial *641 restraint. Almost certainly, if the concurring/dissenting justice’s position on standing were ever to prevail in Michigan, or nationally, the judicial branch of government would quickly become a far more dominant force, and the representative and accountable branches of government would become far less relevant.

 Doubtless in the next case — or at least in the next case in which she is less enthusiastic about “any person” suing “any person” for anything at all — the concurring justice will opine that, unlike in the instant case, the plaintiffs in that case do not have the same “strong personal manifestations, called ‘passive use’ or ‘standby value’ interests,” post at 688, that will ensure the same “sincere and vigorous” advocacy as here. “These interests ensure that environmental suits are vigorously pursued by people with a strong personal belief in their claim.” Id. at 688.

 Indeed, the fact that Justice Kelly feels impelled to articulate her “flexible” understanding of the separation of powers provision in the first place suggests an awareness that the imposition upon the judiciary of a duty to resolve non-cases and non-controversies exceeds the traditional “judicial power.”

 Justice Kelly makes a similarly inappropriate, and irrelevant, connection between these cases in Preserve the Dunes, supra at 2, asserting that, despite the very different legal issues involved in these cases, and despite the fact that we reach no conclusion at all about the meaning of MEPA in the instant case, that our holdings “compound” one another. Only, perhaps, in the sense that the concurring justice’s decisions in entirely unrelated criminal cases, involving entirely different legal issues, “compound” one another.

 In the interest of perspective, we note once more that the majority has found that the plaintiffs in this case — environmental plaintiffs— possess standing to pursue their cause of action. They have prevailed. In identifying such standing, however, the majority has found it to exist under traditional precepts of standing and has avoided the resolution of a constitutional issue that it need not prematurely address. See n 21.

 Despite characterizing the majority’s discussion on standing in section in as “simply dicta,” post at 677, a point with which we agree, Justice Kelly simultaneously, and perplexingly, concludes that this case “stands for the proposition” addressed in this section. Id. at 677.

 In response to Justice Weaver’s assertion that, “[a]fter more than 30 years, MEPA has not spawned an unmanageable stream of citizen-suits . . . ,” post at 671 n 30, the majority simply reiterates that there has never been a decision of this Court holding under MEPA that “any person” could sue “any person.” In response to Justice Kelly, the majority simply notes that it is underwhelmed by the purported safeguards that she identifies to what she characterizes as our “parade of horribles.” Id. at 690. It is fortunate for the people of Michigan that, at least for the time being, their freedoms and fortunes will not be dependent upon such “safeguards.”