TAYLOR, C.J.
The first issue in this case is whether a letter sent by a resident taxpayer to a public official that “request[s]” the official “investigate and halt” the use of public funds for illegal purposes is adequate to constitute a “demand” pursuant to MCL 129.61 so as to allow the taxpayer, should the public official not act, to undertake a legal challenge to the expenditure of the public funds. We conclude that a letter that conveys a call to act is sufficient to constitute a demand. Having *340 concluded that the plaintiffs’ letters did constitute a demand as contemplated by MCL 129.61, we are required to consider whether plaintiffs have constitutional standing to pursue the lawsuit authorized by the statute. We conclude that they do not and hold that MCL 129.61 is unconstitutional to the extent that it confers standing on taxpayers who do not meet the three-part test for determining whether a party has constitutional standing.
Although we disagree with that part of the Court of Appeals opinion that determined that plaintiffs’ letters did not constitute a demand under MCL 129.61, on the basis that the plaintiffs lack constitutional standing to sue, we affirm the lower court judgments that held that plaintiffs could not proceed with their lawsuit.
I. PACTS AND PROCEDURAL HISTORY
Plaintiffs are Ann Arbor public school district taxpayers who brought suit to challenge the school district’s expenditure of public funds to provide health insurance benefits to same-sex domestic partners of school employees. Their complaint alleged that the expenditure of public funds for that purpose violates MCL 551.1, which defines marriage to exclude same-sex unions.[1] Before filing their lawsuit, several of the plain *341 tiffs sent identical letters to various school board members and other local and state officials, including the county prosecutor, the Attorney General, and the Governor. Each letter stated:
I [We] write to request that you investigate and halt the use of public funds to provide so-called “domestic partnership” benefits to employees of the Ann Arbor public schools. I [We] believe that the School District’s extension of these benefits to its employees exceeds its authority and violates the state law governing marriage. I [We] ask that you halt this illegal use of public funds at your earliest possible convenience.
After the Ann Arbor Education Association, MEA/NEA, intervened as a defendant on behalf of its *342 members, defendants moved for summary disposition pursuant to MCR 2.116(C)(5) (The party asserting the claim lacks the legal capacity to sue.). The trial court granted the motion, determining that plaintiffs failed to bring their suit on behalf of the school district treasurer. The trial court also ruled that plaintiffs’ letters failed to comply with the statute in that they did not make a “demand.”
Plaintiffs appealed, and the Court of Appeals affirmed in a published opinion.[2] Although the panel disagreed with the trial court that the plaintiffs had failed to bring suit on behalf of the treasurer, the Court nevertheless affirmed the dismissal of the plaintiffs’ lawsuit because it agreed that plaintiffs’ requests to the board of education and other governmental officials that they halt the “illegal use of public funds” were insufficient to satisfy the statute’s specific-demand requirement.
Plaintiffs filed an application for leave to appeal in this Court. We first ordered oral argument on whether to grant the application or take other peremptory action pursuant to MCR 7.302(G)(1), asking the parties to address only the issue of what constitutes an effective demand under MCL 129.61.[3] Thereafter, we granted leave to appeal, asking the parties to brief whether plaintiffs had standing.[4]
II. STANDARDS OF REVIEW
We review de novo a grant or denial of summary disposition. Nastal v Henderson & Assoc Investigations, *343 Inc, 471 Mich 712, 720; 691 NW2d 1 (2005). Whether plaintiffs’ letters constituted a “demand” under MCL 129.61 is a matter of statutory interpretation. We review questions of statutory interpretation de novo. Miller v Miller, 474 Mich 27, 30; 707 NW2d 341 (2005).
III. ANALYSIS OF MCL 129.61
As relevant to the question whether plaintiffs’ letters constituted a demand under MCL 129.61,[5] the statute provides, in relevant part, “Before such suit is instituted a demand shall be made on the public officer, board or commission whose duty it may be to maintain such suit followed by a neglect or refusal to take action in relation thereto.”
The Court of Appeals noted that the term “demand” is defined in the Random House Webster’s College Dictionary (1997) as “to ask for with proper authority; claim as a right,”[6] and that the statutory phrase “main *344 tain such suit” indicates that “the purpose of the demand requirement is to inform the appropriate party that legal action is forthcoming.” 265 Mich App at 710. It then concluded that plaintiffs’ letters did not constitute a “demand” because they were “merely a request that the alleged misappropriation stop; they are not a demand for legal action.” Id.
We disagree with the Court of Appeals analysis and conclude that plaintiffs’ “request” was sufficient to satisfy the statute’s “demand” requirement. Indeed, a request that the Attorney General halt something asserted to be illegal can only be reasonably understood, in the context of a demand to the state’s top legal officer, as a demand that he or she take steps to stop such actions up to and including bringing a lawsuit. While plaintiffs did not use the word “demand” in their letters, their “request” is properly considered a “demand.” Plaintiffs were not required to use the word “demand.”[7] All that is required is a communication that would reasonably be understood as a demand. We agree with plaintiffs that utilization of the more civil, polite term “request” is more likely to secure the desired result of halting an unlawful expenditure than a more provocative “demand.” After all, the apparent object of the statute is to halt unlawful expenditures, not to engender litigation.
*345 We reject defendants’ claim that the letters were insufficient because they failed to cite the statute. MCL 129.61 includes no requirement that the demand refer to the statute. Defendants also argue that plaintiffs’ letters were insufficient to meet the demand requirement because the letters did not request either an accounting or the recovery of the funds expended. MCL 129.61 provides that a taxpayer may file a lawsuit “for an accounting and/or the recovery of funds or moneys misappropriated or unlawfully expended ....” The statute, however, does not provide that the taxpayer’s preliminary demand must specifically be for an accounting or the recovery of funds.
Defendants further argue that plaintiffs’ letters were insufficient to meet the demand requirement because they did not contain a sense of urgency, and plaintiffs did not act upon them by filing a lawsuit until almost three years later. But MCL 129.61 does not require that the demand be made with a “sense of urgency.” Plaintiffs requested a halt to the expenditure of public funds “at your earliest possible convenience.” This phrase is a request that action be taken as soon as possible. It is sufficient especially because there is no requirement in the statute that the demand convey a sense of urgency.
We also disagree with the Court of Appeals suggestion that MCL 129.61 requires a demand for litigation. The statute provides that before a taxpayer may institute a lawsuit, a demand must be made “on the public officer, board or commission whose duty it may be to maintain such suit” for recovery of unlawfully expended funds. The statute does not expressly require that the demand be for a lawsuit. Further, just because the public body has the ultimate duty to bring a lawsuit if it is needed does not mean that the demand must be for a lawsuit. The taxpayer demand, at a minimum, *346 calls on a conscientious public body to reevaluate whether it is carrying out its duties properly and, in fact, this may result in the public body’s acting in compliance with the demand. It may do this by any number of means, only one of which is to enter into litigation. In fact, when the statute uses the phrase “whose duty it may be to maintain such suit” (emphasis added), it recognizes this. Moreover, the statute provides that after a demand, before the taxpayer may bring a suit, a precondition is that the public body must neglect or refuse “to take action in relation thereto.” This implies that the public body need not necessarily file suit, only that it needs to take some kind of action relating to the matter.[8]
We therefore conclude that the demand made in this matter was sufficient to satisfy MCL 129.61.
IV CONSTITUTIONAL STANDING
Having determined that plaintiffs’ letters satisfied the requirements of MCL 129.61, we are required to decide whether plaintiffs have constitutional standing to pursue their lawsuit. That is, even though we have determined that plaintiffs are authorized by the Legislature to bring this lawsuit, we must determine whether the independent constitutional requirement of standing presents a separate bar to the lawsuit.
*347 First, as we stated in Lee v Macomb Co Bd of Comm’rs, 464 Mich 726; 629 NW2d 900 (2001):
It is important, initially, to recognize that in Michigan, as in the federal system, standing is of great consequence so that neglect of it would imperil the constitutional architecture whereby governmental powers are divided between the three branches of government.
“[T]he doctrine of standing [is] a constitutional principle that prevents courts of law from undertaking tasks assigned to the political branches. It is the role of courts to provide relief to claimants, in individual or class actions, who have suffered, or will imminently suffer, actual harm; it is not the role of courts, but that of the political branches, to shape the institutions of government in such fashion as to comply with the laws and the Constitution.” [Id. at 735-736, quoting Lewis v Casey, 518 US 343, 349; 116 S Ct 2174; 135 L Ed 2d 606 (1996) (citations omitted).]
In Lee we adopted the test the United States Supreme Court uses to determine whether a federal court has standing to hear a lawsuit[9] and concluded:
*348 “[T]he irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an ‘injury in fact’ — an invasion of a legally protected interest which is (a) concrete and particularized, and (b) ‘actual or imminent, not “conjectural” or “hypothetical.” ’ Second, there must be a causal connection between the injury and the conduct complained of — the injury has to be ‘fairly... trace[able] to the challenged action of the defendant, and not... th[e] result [of] the independent action of. some third party not before the court.’ Third, it must be ‘likely,’ as opposed to merely ‘speculative,’ that the injury will be ‘redressed by a favorable decision.’ ” [Lee, supra at 739, quoting Lujan v Defenders of Wildlife, 504 US 555, 560-561; 112 S Ct 2130; 119 L Ed 2d 351 (1992).][10]
And, as we explained in Nat’l Wildlife Federation v Cleveland Cliffs Iron Co, 471 Mich 608, 622-623; 684 NW2d 800 (2004):
If the Legislature were permitted at its discretion to confer jurisdiction upon this Court unmoored from any genuine case or controversy, this Court would be transformed in character and empowered to decide matters that have historically been within the purview of the Governor and the executive branch----Unless there is an individual who has personally been injured by the Governor’s enforcement or administration of these laws, it is not normally the role of the judicial branch to monitor the work of the executive and determine whether it is carrying out its responsibilities in an acceptable *349 fashion. That the Legislature — perhaps even with the acquiescence of the executive — has purported to impose this role upon the judicial branch does not alter this constitutional reality.
In Cleveland Cliffs we explained that but for a few enumerated exceptions,[11] the definitions of “judicial power” in the United States and Michigan constitutions are identical — both require an “injury in fact” that is both concrete and particularized, as well as actual or imminent, in order to establish standing. Id. at 624-629. The Legislature may not confer jurisdiction upon the court “unmoored from any genuine case or controversy ....” Id. at 622. If the Legislature were to do so, “this Court would be transformed in character and empowered to decide matters that have historically been within the purview of the Governor and the executive branch.” Id.[12]
*350 We did, however, recognize in Cleveland Cliffs that persons bringing qui tam actions[13] were found to have standing by the United States Supreme Court in Vermont Agency of Natural Resources v United States ex rel Stevens 529 US 765, 774-777; 120 S Ct 1858; 146 L Ed 2d 836 (2000). We stated:
Accordingly, the [ Vermont Agency] Court held that one who brings a relator suit has standing because he is the assignee of a claim and may assert the injury-in-fact suffered by the assignor, which is normally the government. Id. at 773. In such cases, the Court concluded, the government’s injury-in-fact suffices to confer standing on the individual relators bringing the suit. Id. at 774.
[T]he use of citizen suits or actions by private attorneys general does not undermine the application of traditional standing requirements. If anything, the use of such suits supports the application of those requirements, as citizen suits and actions by private attorneys general have always been grounded in a private injury, whether suffered directly or as a result of an assignment by another. [Cleveland Cliffs, supra at 646-647 (emphasis omitted).]
In sum, Cleveland Cliffs holds that the Legislature may not confer standing on a party that does not otherwise meet the constitutional injury-in-fact test for standing. But, under Vermont Agency, the Legislature may create *351 qui tam actions whereby a statute partially assigns the government’s injury in fact claim to a private citizen.
Thus, the question is whether MCL 129.61 creates a qui tam action or an action similar enough to a qui tam action to constitutionally confer standing. In arguing that MCL 129.61 does effectively create a qui tam action, the plaintiffs, drawing on Vermont Agency, point out the similarities between the federal False Claims Act at issue in Vermont Agency, 31 USC 3729 to 3733, and MCL 129.61. These include, first, that both statutes allow a private citizen to bring a civil action on behalf of the government. Second, both statutes require the private citizen to give the government the opportunity to prosecute the claim on its own behalf, and, finally, that both statutes allow the citizen to go forward with the civil action if the government fails to do so. Yet, while the above similarities exist, the crucial difference between the False Claims Act and MCL 129.60 is that the False Claims Act gives a litigant a concrete private interest in the outcome of the suit, and thus constitutional standing, by providing a bounty.[14] There is no similar provision in MCL 129.61, which has not only no bounty provision but no other mechanism that even conceivably could establish such a private interest.
A second significant distinction between a typical qui tam action (like the one in Vermont Agency) and MCL 129.61 is that MCL 129.61 does not have a provision allowing the government to intervene and assume control of the suit. The Vermont Agency Court held that a qui tam relator under the federal False Claims Act has standing because he or she is properly considered a partial assignee *352 to assert the injury in fact suffered by the government. This implies that the statute’s assignment of claims must be partial rather than full to be valid.[15] Because there is no assignment of any sort in MCL 129.61, this key aspect found in the False Claims Act is also missing.
Moreover, the state, again, unlike the federal government in a situation involving the False Claims Act, is not the real party in interest in a suit brought under MCL 129.61. Our statute does not require the plaintiff to follow procedural safeguards found in the False Claims Act as well as other modern qui tarn statutes to ensure that the government remains fully apprised of the litigation, has the opportunity to participate, and retains the power to make key decisions over the relator’s objections.[16]
*353 For these reasons then, we conclude that MCL 129.61 did not establish a qui tam action that would give plaintiffs constitutional standing to pursue their lawsuit.
Plaintiffs argue in the alternative that even if MCL 129.61 does not establish a qui tam action, they nevertheless must have standing under House Speaker v Governor, 443 Mich 560; 506 NW2d 190 (1993), because there the plaintiffs, who had no more of a claim to standing than plaintiffs in this case have, were found to have standing. We disagree. In House Speaker, the issue was whether the private nonprofit, corporate plaintiffs had standing to challenge the Governor’s authority to transfer the powers of a legislatively created body to a new, gubernatorially created body. The Court, while acknowledging the general principle that standing requires a litigant to “ ‘demonstrare] that [its] substantial interest will be detrimentally affected in a manner different from the citizenry at large,’ ” id. at 572 (citation omitted), inexplicably neglected to actually apply that principle. What the Court did do, puzzlingly, was to conclude that because the civic groups met the requirements of MCR 2.201(B)(4),[17] a court rule that in essence gives qualifying persons or groups the right to *354 sue without an injury, they could sue. Yet, as Lee and Cleveland Cliffs made clear, no court rule or statute can eliminate the injury requirement for constitutional standing. Thus, House Speaker is not dispositive and is of limited value because the Court did not address whether the court rule (MCR 2.201) or the corresponding statute (MCL 600.2041) could constitutionally confer standing to an organization that did not have a concrete interest in the suit and did not suffer an injury in fact. To the extent one might read it as having silently done so, we disapprove of it as being inconsistent with Lee and Cleveland Cliffs.[18]
Plaintiffs admit that their injury is minute and generalized. Thus, it is not a concrete and particularized injury in fact. Indeed, any “remedy” they might obtain will not confer a financial benefit on them.[19] Moreover, any potential benefit plaintiffs might obtain *355 if they prevailed in this lawsuit would not be any different than that which would be obtained by everyone else in the state. Under such circumstances, they do not have constitutional standing.[20]
V CONCLUSION
For all the reasons we have set forth, we conclude that although plaintiffs’ demand under MCL 129.61 was sufficient, this statute is unconstitutional to the extent that it purports to confer standing on taxpayers who have not satisfied the Lee/Cleveland Cliffs standing requirements.
We reject that part of the Court of Appeals judgment that determined that plaintiffs’ letters did not constitute a demand under MCL 129.61, but, on the basis that plaintiffs lack constitutional standing to sue, we affirm the lower court judgments that held that plaintiffs could not proceed with their lawsuit. We remand the case to the trial court for entry of an order dismissing plaintiffs’ lawsuit.
Affirmed and remanded to the trial court.
Corrigan, Young, and Markman, JJ., concurred with Taylor, C.J.

 MCL 551.1 provides:
Marriage is inherently a unique relationship between a man and a woman. As a matter of public policy, this state has a special interest in encouraging, supporting, and protecting that unique relationship in order to promote, among other goals, the stability and welfare of society and its children. A marriage contracted between individuals of the same sex is invalid in this state.
At the same time MCL 551.1 was enacted in 1996, MCL 551.271, which provides for recognition of marriages contracted in other states, was amended to state:
*341 This section does not apply to a marriage contracted between individuals of the same sex, which marriage is invalid in this state.... [MCL 551.271(2).]
Also enacted at the same time was MCL 551.272, which provides:
This state recognizes marriage as inherently a unique relationship between a man and a woman, as prescribed by [MCL 551.1], and therefore a marriage that is not between a man and a woman is invalid in this state regardless of whether the marriage is contracted according to the laws of another jurisdiction.
It is also the case that after this lawsuit was filed, effective December 18, 2004, Const 1963, art 1, § 25 was added by vote of the people to provide:
To secure and preserve the benefits of marriage for our society and for future generations of children, the union of one man and one woman in marriage shall be the only agreement recognized as a marriage or similar union for any purpose.
The Court of Appeal recently issued a published opinion holding that art 1, § 25 forbids public employers from offering same-sex health-care benefits. A motion for reconsideration was denied by that Court on March 6, 2007. Nat’l Pride at Work, Inc v Governor, 274 Mich App 147; 732 NW2d 139 (2007), lv gtd 478 Mich 862 (2007).

 Rohde v Ann Arbor Pub Schools, 265 Mich App 702; 698 NW2d 402 (2005).

 474 Mich 1120 (2006).

 477 Mich 924 (2006).

 The full statute reads as follows:
Any person or persons, firm or corporation, resident in any township or school district, paying taxes to such political unit, may institute suits or actions at law or in equity on behalf of or for the benefit of the treasurer of such political subdivision, for an accounting and/or the recovery of funds or moneys misappropriated or unlawfully expended by any public officer, board or commission of such political subdivision. Before such suit is instituted a demand shall be made on the public officer, board or commission whose duty it may be to maintain such suit followed by a neglect or refusal to take action in relation thereto. Security for costs shall be filed by the plaintiff or plaintiffs in any such suit or action and all costs and expenses of the same shall be paid by the person or persons instituting the same unless and until a recovery of such funds or moneys he obtained as the result of such proceedings.

 Black’s Law Dictionary (8th ed) defines “demand” as “[t]he assertion of a legal or procedural right.” This is consistent with the legal definition *344 of a “demand letter,” which is: “A letter by which one party explains its legal position in a dispute and requests that the recipient take some action (such as paying money owed), or else risk being sued.” Id.

 See, e.g., Shallal v Catholic Social Services of Wayne Co, 455 Mich 604, 616; 566 NW2d 571 (1997) (“A plaintiff should not be required to say “magic words” in order to reap the protections of the [whistle-blowers’ protection] statute.”). Cf. Burt Twp v Dep’t of Natural Resources, 459 Mich 659, 669; 593 NW2d 534 (1999) (“[W]e decline to require that the Legislature use any particular talismanic words to indicate its intent.”).

 We also reject the Court of Appeals dictum that plaintiffs were required to send the demand to the school district treasurer, as “the officer likely responsible for maintaining such a lawsuit.” 265 Mich App at 710. There is no indication in the statute that the demand had to be served specifically on the treasurer, as opposed to other key figures in the school district. MCL 129.61 provides that the demand must be made on the “public officer, board or commission” whose duty it may be to maintain the suit. This language makes it clear that demand on a board, rather than one specific member of the board (such as a treasurer), is sufficient. Here, plaintiffs sent letters to all nine members of the school board as well as the superintendent. This was sufficient to give the school district and the treasurer notice of the demand.

 Justice Kelly asserts that we have “ignored” the United States Supreme Court’s statement in Massachusetts v Mellon, 262 US 447, 486; 43 S Ct 597; 67 L Ed 1078 (1923), that “ ‘[t]he interest of a taxpayer of a municipality in the application of its moneys is direct and immediate and the remedy by injunction to prevent their misuse is not inappropriate.’ ” Post at 363. First, this statement is dictum in light of the fact that the Supreme Court determined that it did not have jurisdiction to hear the challenges raised in Mellon. Second, Justice Kelly ignores the fact that, just two sentences later, the Supreme Court noted that “there are decisions to the contrary. See, for example, Miller v Grandy, 13 Mich 540, 550 [1865].” Mellon, supra at 486. In Miller, which has never been overruled, this Court held that “a private tax payer, suffering under no special grievance, is not even a proper party to a bill filed to restrain threatened misconduct. . . .” Miller, *348 supra at 550. Therefore, we “ignore” dicta from Mellon because, by its own terms, it is inapplicable in determining the scope of the judicial power in Michigan.

 In Lujan, the United States Supreme Court held that the plaintiffs lacked constitutional standing to bring suit under a provision of the Endangered Species Act of 1973 that contained a citizen-suit provision that permitted “any person [to] commence a civil suit on his own behalf — (A) to enjoin any person, including the United States and any other governmental instrumentality or agency ... who is alleged to be in violation of any provision of this act....” 16 USC 1540(g)(1). The Court in effect held that this provision was unconstitutional as applied to a citizen who lacks constitutional standing.

 Const 1963, art 3, § 8 allows either house of the Legislature to request the Supreme Court to issue an advisory opinion on the “constitutionality of legislation”; Const 1963, art 9, § 32 confers upon “[a]ny taxpayer of the state” standing to bring suit to enforce the provisions of the so-called Headlee Amendment; and Const 1963, art 11, § 5 empowers “any citizen of the state” to initiate proceedings for injunctive or mandamus relief to enforce the civil service laws of the state.

 See, also, Federated Ins Co v Oakland Co Rd Comm, 475 Mich 286; 715 NW2d 846 (2006), where we discussed the issue of statutorily conferred standing. This Court held that MCL 14.101 and MCL 14.28 did not give the Attorney General standing to intervene to appeal the Court of Appeals judgment, because the Attorney General did not represent an “aggrieved party.” In particular, the Court held:
To the extent one might read MCL 14.101 or MCL 14.28 as allowing the Attorney General to prosecute an appeal from a lower court ruling without the losing party below also appealing, and without the Attorney General himself being or representing an aggrieved party, the statutes would exceed the Legislature’s authority because, except where expressly provided, this Court is not constitutionally authorized to hear *350 nonjusticiable controversies. Nat’l Wildlife Federation, supra at 614-615. To give these statutes such a reading would contravene an operative presumption of this Court that we presume constitutional intent on the part of the Legislature. [Federated, supra at 294-295.]

 “Qui tam” is an abbreviation of a Latin phrase that means “ ‘who pursues this action on our Lord the King’s behalf as well as his own.’ ” Vermont Agency of Natural Resources v United States ex rel Stevens, 529 US 765, 769 n 1; 120 S Ct 1858; 146 L Ed 2d 836 (2000) (citation omitted).

 The concept of a bounty is that the plaintiff recovers some of the money judgment if the lawsuit succeeds. For example, the federal False Claims Act awards a relator between 15 and 30 percent of the government’s recovery. 31 USC 3730(d)(l)-(2).

 See, e.g., Gilles, Representational standing: US ex rel Stevens and the future of public law litigation, 89 Cal L R 315,346 (2001) (It is likely that full assignment of proprietary claims by the government, under a legislative regime that prohibits the executive from intervening or exercising any control over assigned claims, would violate separation of powers.).

 For example, the federal False Claims Act, 31 USC 3730 (b) to (f), protects the interest of the United States in the following ways: (1) the relator must serve the complaint and written disclosure of material evidence on the government before the complaint is served on the defendant; (2) the relator must file the complaint in camera and the complaint must remain under seal while the government conducts an investigation, and the relator must not serve the defendant except by court order; (3) the government must either intervene and take over the conduct of the action before the defendant is served or notify the court that the relator will be conducting the action; (4) if the government proceeds with the action, it has primary responsibility for prosecuting the lawsuit and is not bound by the acts of the relator; (5) the government may dismiss or settle the action over the objection of the relator; (6) the government must give written consent before the case is dismissed; (7) the government is protected from liability for litigation expenses of the qui tarn relator; and (8) the government receives at least 70 percent of any recovery.

 This court rule provides:
An action to prevent illegal expenditure of state funds or to test the constitutionality of a statute relating to such an expenditure may be brought:
(a) in the name of a domestic nonprofit corporation organized for civic, protective, or improvement purposes; or
(b) in the names of at least 5 residents of Michigan who own property assessed for direct taxation by the county where they reside.
The statutory counterpart to this court rule is MCL 600.2041(3).

 Justice Weaver’s partial dissent reiterates her standard response to the recent standing decisions from this Court that were decided by, yes, a majority, as they always have been since 1837. See Lee, Cleveland Cliffs, Federated Ins Co v Oakland Co Rd Comm, 475 Mich 286; 715 NW2d 846 (2006), Michigan Chiropractic Council v Comm’r of the Office of Financial & Ins Services, 475 Mich 363; 716 NW2d 561 (2006), and Michigan Citizens for Water Conservation v Nestlé Waters North America Inc, 479 Mich 556; 737 NW2d 447 (2007), and our responses in these cases.
Justice Weaver’s position on standing, described by her as “prudential standing,” is that there are no immutable rules or standards a litigant must meet to have standing to sue; rather, the court decides as it wishes on a case-by-case basis if a party has standing. The proper understanding of such an approach is as a standing regime with no rules and unlimited power for the judiciary. When no one can know the law in advance, and, of course, no conscientious judge could then operate under it in a principled fashion, no other description suffices. The judicial standing rule we have adopted has no such defect. In short, hers is an essentially arbitrary approach that no amount of accusatory verbiage can camouflage.

 MCL 129.61 merely calls for an accounting or a return of funds to the state entity.

 See also Waterford School Dist v State Bd of Ed, 98 Mich App 658, 662; 296 NW2d 328 (1980), stating that a private citizen has no standing to vindicate a public wrong or enforce a public right where that citizen has not been hurt in any manner different from the citizenry at large, and Menendez v Detroit, 337 Mich 476, 482; 60 NW2d 319 (1953), stating that a “private taxpayer, suffering no special grievance, is not a proper party plaintiff to a bill of complaint filed to restrain threatened official misconduct.”