Kelly, J.
(dissenting). The sole issue we decide is whether plaintiffs have standing to challenge the effects of pumping activities by defendant Nestlé Waters North America Inc. on the Osprey Lake Impoundment and wetlands 112, 115, and 301. The majority holds that plaintiffs have failed to establish standing to challenge the pumping in these areas. In dissent, Justice WEAVER reaches the opposite conclusion. In so doing, she rejects the standing test adopted by the majority in Lee v Macomb Co Bd of Comm’rs[1] and Nat’l Wildlife Federation v Cleveland Cliffs Iron Co.[2] While I agree with Justice *324 Weaver’s conclusion and her analysis of these decisions, I also recognize that Lee and Cleveland Cliffs now constitute binding precedent of this Court. And because I would hold that plaintiffs have established standing under Lee and Cleveland Cliffs, I find it unnecessary to consider whether these decisions should be overruled.
PACTS
This case involves a number of interconnected bodies of water in Mecosta County, Michigan. The Osprey Lake impoundment (Osprey Lake) is a man-made body of water created by damming the Dead Stream. South of Osprey Lake is Thompson Lake. Wetlands 112,115, and 301 are located to the west and north of Osprey Lake. The wetlands, the Dead Stream, and the lakes are directly connected to and part of the same shallow, unconfined spring aquifer.
In December 2000, defendant Nestlé purchased the groundwater rights to the area known as Sanctuary Springs, located to the north of Osprey Lake. Shortly afterwards, it announced plans to build a spring water bottling plant. Plaintiff Michigan Citizens for Water Conservation (MCWC) was formed then to represent the interests of the riparian property owners in the area. MCWC has over 2,000 members, including plaintiffs R. J. and Barbara Doyle, who own land on the Dead Stream, and plaintiffs Jeffrey and Shelly Sapp, who own land on Thompson Lake.
In 2001, Nestlé installed four wells on the Sanctuary Springs property. The combined maximum pumping rate permitted for the wells was 400 gallons a minute. Later that year, plaintiffs filed their complaint. The complaint consisted of (1) a claim for an injunction, (2) a claim that withdrawal of water violated the common law applicable to riparian water rights, (3) a claim that *325 the withdrawal violated the common law applicable to groundwater, (4) a claim that the water of Sanctuary Springs is subject to the public trust doctrine, (5) a claim that Nestlé’s use of the water would be an unlawful taking, and (6) a claim that the water extractions violated the Michigan Environmental Protection Act (MEPA). MCL 324.1701 et seq.
A trial was held on the groundwater and MEPA claims only. It lasted 19 days, and the transcript contains more than 3,700 pages. Ultimately, the trial court held that plaintiffs had stated a prima facie case under MEPA with respect to Osprey Lake, Thompson Lake, the Dead Stream, the Dead Stream wetlands, and wetlands 115,112, and 301. The court found the appropriate remedy to be an injunction against all pumping operations at the site.
In reaching its decision, the trial court made a number of findings of fact. It found that, for every gallon of water diverted or removed by the pumping, there is a corresponding loss of water to Osprey Lake, the Dead Stream, Thompson Lake, and the wetlands. It found that the pumping activities would cause Dead Stream’s surface level to drop two inches and that the Dead Stream wetlands would lose at least 2 inches. It found that wetland 115 would suffer a drop in water level of 1.5 feet, wetland 112 would drop at least 3 inches, and wetland 301 would drop 2 to 4 inches. And it found that Osprey Lake and Thompson Lake would drop by as much as 6 inches. The court found that the result would be that the Dead Stream’s use as a fishery and recreational area would be reduced; that the bottom of the wetlands would become exposed, which could cause the areas to become choked with vegetation; and that a level-control structure would need to be installed to maintain the lakes’ water levels.
*326 Defendants appealed from the trial court’s injunctive order, arguing, among other things, that plaintiffs lacked standing with respect to Osprey Lake and wetlands 112, 115, and 301. Writing for a divided court, Judge MURPHY concluded that plaintiffs had standing to assert MEPA claims over all the areas identified by the trial court. Michigan Citizens for Water Conservation v Nestlé Waters North America Inc, 269 Mich App 25, 113; 709 NW2d 174 (2005) (opinion by MURPHY, J.).
Judge SMOLENSKI dissented on the standing issue. He would have found that plaintiffs do not have standing to assert claims over Osprey Lake and wetlands 112, 115, and 301. He believed that, in regard to these areas, plaintiffs had not suffered harm that was different from the citizenry at large. Id. at 83 (opinion by SMOLENSK!, J.).
Both sides applied for leave to appeal in this Court. We scheduled oral argument on the applications, directing the parties to address “only whether the plaintiffs have standing under Nat’l Wildlife Federation v Cleveland Cliffs Iron Co, 471 Mich 608 (2004), to bring claims related to the Osprey Lake impoundment and wetlands 112, 115, and 301.” 477 Mich 892 (2006).
THE STANDING ISSUE
In Lee v Macomb Co Bd of Comm’rs, this Court expressly adopted the standing test articulated by the United States Supreme Court in Lujan v Defenders of Wildlife, 504 US 555; 112 S Ct 2130; 119 L Ed 2d 351 (1992). The test has three elements:
“First, the plaintiff must have suffered an ‘injury in fact’ — an invasion of a legally protected interest which is (a) concrete and particularized, and (b) ‘actual or imminent, not “conjectural” or “hypothetical.” ’ Second, there must be a causal connection between the injury and the *327 conduct complained of — the injury has to be ‘fairly... trace[able] to the challenged action of the defendant, and not... the result [of] the independent action of some third party not before the court.’ Third, it must be ‘likely,’ as opposed to merely ‘speculative,’ that the injury will be ‘redressed by a favorable decision.’ ” [Lee, 464 Mich at 739, quoting Lujan, 504 US at 560-561.]
In Nat’l Wildlife Federation v Cleveland Cliffs Iron Co, this Court re-affirmed Lee’s adoption of the Lujan test and applied the three factors to environmental plaintiffs. Nat’l Wildlife Federation, 471 Mich at 628-629.
The resolution of the case before us turns on the correct application of the injury-in-fact component of the test. In applying that component, the majority overlooks a basic purpose of the standing doctrine. As stated in Nat’l Wildlife Federation, the purpose of requiring plaintiffs to show injury in fact is to ensure that “a genuine case or controversy [exists] between the parties, one in which there is a real, not a hypothetical, dispute.” Nat’l Wildlife Federation, 471 Mich at 615. See ante at 293. However, the injury-in-fact requirement is not meant to prevent plaintiffs from protecting the public interest when the concerns underlying the requirement have been satisfied. The United States Supreme Court has instructed:
[S]o long as the [standing] requirement is satisfied, persons to whom [the Legislature] has granted a right of action, either expressly or by clear implication, may have standing to seek relief on the basis of the legal rights and interests of others, and, indeed, may invoke the general public interest in support of their claim. [Warth v Seldin, 422 US 490, 501; 95 S Ct 2197; 45 L Ed 2d 343 (1975).]
The federal courts have consistently applied the principle that, once a plaintiff has established standing to challenge an activity, that plaintiff also has standing to invoke the general public interest. In Citizens Com *328 mittee Against Interstate Route 675 v Lewis,[3] the plaintiffs alleged that the defendants’ plan to build a segment of 1-675 violated the National Environmental Policy Act (NEPA). 542 F Supp at 522. The defendants conceded that plaintiff Mione had standing to challenge the construction of the highway because he used the land that would be taken to build the road. Id. at 523. However, the defendants claimed that the plaintiffs had no standing to challenge the “socio-economic impacts upon the City of Dayton, because [neither Mione nor any of the other plaintiffs had claimed injury] which arises from that act.” Id. The court disagreed, concluding that, since plaintiff “Mione has standing to advance his environmental injury in fact, it is clear,. . . that Mione has standing, based upon the public interest, to raise other alleged inadequacies of the [final environmental impact statement], including... the socioeconomic impacts of 1-675 upon the City of Dayton.” Id. at 524.
Likewise, in Sierra Club v Adams,[4] the plaintiffs brought suit seeking an injunction to stop the government from constructing a highway because the government had failed to prepare an environmental impact statement. The defendants conceded that the plaintiffs had standing to challenge the failure to adequately consider the potential spread of aftosa.[5] But the defendants argued that the plaintiffs did not have standing to challenge the failure to consider the effect of the construction on the Cuna and Choco Indians. Id. at 149. Considering this argument, the court found that the plaintiffs had not alleged that the government’s failure to consider the effect of construction on the Indian *329 tribes caused any specific harm to them. Id. at 149-150. Nonetheless, the court decided that, because the plaintiffs had standing to challenge the action on at least one ground, they could also raise other inadequacies in the environmental impact statement. These included the failure to consider the effects on the Indian tribes. Id. at 150.
In Alaska Ctr for the Environment v Browner,[6] the plaintiffs brought suit to compel the Environmental Protection Agency (EPA) to establish total maximum daily loads (TMDLs) for Alaskan waters. Id. at 982. The EPA challenged the lower court’s statewide remedy, claiming that the plaintiffs had demonstrated an injury in fact with respect to only a limited number of waters in the state. Id. at 984. According to the EPA, it was proper to order it to establish TMDLs only for the bodies of water that the plaintiffs actually used. The Court of Appeals for the Ninth Circuit rejected this argument, concluding that the plaintiffs could challenge the failure to establish TMDLs on the basis of how the EPA’s actions affected them. But the plaintiffs could challenge the failure, also, on the basis of the total effect of the EPA’s actions. Id. at 985. The court explained that, once standing is established, “ ‘the appropriate scope of the remedy goes to the merits of plaintiffs’ claims and is ultimately limited by the statutory authority,’ ” not by the standing doctrine.[7] Id. (citation omitted).
*330 This discussion illustrates that, once a plaintiff has standing to challenge contested activity, it can raise other inadequacies on the basis of the public interest.[8] As the majority concedes, plaintiffs have standing to challenge the pumping on the basis of its effects on the Dead Stream and Thompson Lake. Because plaintiffs have standing to challenge that pumping, they can assert not only their own interests but also the interests of the general public.[9] Therefore, plaintiffs have standing to assert a MEPA claim challenging the total effects of the pumping, including its effects on Osprey Lake and wetlands 112, 115, and 301.[10]
The majority disagrees and determines that plaintiffs cannot assert the general public interest in support of their claim because they do not have standing to assert a claim. This decision contradicts other findings in the majority opinion. The majority concedes that plaintiffs have standing to challenge the pumping as it relates to the Dead Stream and Thompson Lake. As a result, the majority necessarily decides that plaintiffs have a claim under MEPA. Simultaneously, however, the majority concludes that plaintiffs cannot invoke the general *331 public interest in support of their MEPA claim because plaintiffs do not have a claim under MEPA.[11]
The majority also finds that the statement from Warth on which I rely is dictum. The statement in Warth echoes similar statements from earlier United States Supreme Court decisions. See Sierra Club v Morton, 405 US 727, 740 n 15; 92 S Ct 1361; 31 L Ed 2d 636 (1972); Fed Communications Comm v Sanders Bros Radio Station, 309 US 470, 477; 60 S Ct 693; 84 L Ed 869 (1940). It would be odd for the Supreme Court to repeatedly rely on this statement in its decisions if it did not consider the statement to be a binding rule of law. Moreover, numerous federal cases that I have discussed proceed as if the statement from Warth is a holding. E.g., Lewis, 542 F Supp at 523; Adams, 578 F2d at 392. If the federal courts treat the statement as precedent, there is every reason for this Court to do so, as well.[12]
The majority implies that the federal cases I discuss should be ignored because the statement I rely on from Warth is unique to the area of federal administrative law. There are numerous fallacies in this position. First, a large number of federal standing decisions, notably Lujan v Defenders of Wildlife, are from cases in which one party is a governmental entity. Thus, it is not surprising that the decisions I discuss include some of these cases. What the majority fails to demonstrate is that the United States Supreme Court has separated its *332 law regarding standing in administrative law cases from its law regarding standing in other cases.
Second, there is no principled reason for this Court to make such a distinction. In Warth, the plaintiffs challenged a zoning ordinance of the. defendant town, claiming that the ordinance violated their constitutional rights by excluding persons of low income from living in the town. 422 US at 493. In this case, plaintiffs claim that Nestlé’s pumping has injured them by harming the environment. The majority has not explained the relevance of the fact that, in Warth, the defendant is a governmental entity and here, the defendant is a private corporation. In short, the majority has advanced no principled reason for refusing to apply to this case standing decisions from cases where the defendant is a governmental entity.
By refusing to follow the federal decisions that I discuss, the majority indulges in a serious inconsistency. For example, in this case and in Rohde v Ann Arbor Pub Schools,[13] which also was decided today, the majority finds that plaintiffs lacked standing, despite the fact that they would have standing under federal law.
But Michigan’s current standing test is derived exclusively from federal law. Hence, it should follow that plaintiffs in the instant case and the plaintiffs in Rohde have standing. The majority has adopted only a portion of federal standing law. It would seem rational that either Michigan’s standing law is consistently the same as federal standing law or it is consistently different. If it is the same, the majority should accept and follow the decisions I have relied on here. If it is different, then there is no reason to follow other federal standing *333 decisions, including Lujan. The majority should settle on one consistent approach to standing. .
THE MAJORITY’S SEPARATION OP POWERS ARGUMENT
One final point merits addressing. The majority claims that my interpretation of Warth cannot be correct because it “would violate the separation of powers principles upon which ... standing requirements rest.” Ante at 306 n 55. I disagree.
It is uncontested that plaintiffs have standing to assert a MEPA claim challenging defendant Nestlé’s pumping. Accordingly, the issue is not whether plaintiffs have standing to assert a claim under MEPA. The issue is the proper scope of the claim. And the answer is that, because plaintiffs have standing to challenge the pumping, “ ‘the appropriate scope of the remedy goes to the merits of plaintiffs’ claims and is ultimately limited by the statutory authority,’ ”[14] not by the standing doctrine. The majority’s decision to limit the scope of plaintiffs’ cause of action on the basis of standing actually undermines the separation of powers. By extinguishing a valid cause of action, the majority usurps power rightly belonging to the Legislature.
This Court has recognized that the injury-in-fact component of the standing doctrine is necessary to prevent “the judicial branch [from establishing itself] as first among equals, being permitted to monitor and supervise the other branches, and effectively possessing a generalized commission to evaluate and second-guess the wisdom of their policies.” Cleveland Cliffs, 471 Mich at 616. Injury in fact is the factor that separates hypothetical policy disputes from genuine cases or controversies. Id. at 615. By requiring a plaintiff to *334 establish an injury in fact, the courts ensure that they do not overstep their bounds by deciding an issue that rightly belongs to another branch of government. Id. at 616-617.
But once a plaintiff has established standing to challenge the activity at issue, the concern that the judiciary is overstepping its bounds disappears. This is because after a plaintiff has shown that the activity caused him or her an injury in fact, any concern that the court is getting dragged into a hypothetical policy dispute evaporates. Rather, a legitimate controversy then exists between the parties, one that the courts can properly resolve. As the United States Supreme Court has stated, “[t]he test of injury in fact goes only to the question of standing to obtain judicial review. Once this standing is established, the party may assert the interests of the general public in support of his claims ....” Sierra Club, 405 US at 740 n 15. Therefore, once a plaintiff has standing to challenge a given activity, it is not the court’s place to decide whether the Legislature’s grant of a broad cause of action is wise. The Court’s role is simply to adjudicate the dispute.
The law of standing is meant to limit courts to deciding actual cases and to keep them out of the business of “prescribing how the other two branches should function ... .”[15] Today, a majority of this Court oversteps its bounds by telling the Legislature how it should function. It fails to exercise appropriate judicial self-restraint. It extinguishes a valid cause of action for no reason other than its belief that the cause of action granted by the Legislature is too broad. Sadly, the majority does not recognize that this decision is not its to make.
*335 CONCLUSION
Properly applied, the standing doctrine is a shield used to protect the integrity of our tripartite system of government. In its decision today, the majority allows defendant Nestlé to use the doctrine as a sword to insulate its questionable activity from legal challenge. I dissent from this erroneous decision.

 542 F Supp 496 (SD Ohio, 1982).

 188 US App DC 147, 148; 578 F2d 389 (1978).

 Aftosa is also known as foot-and-mouth disease. Id. at 149.

 20 F3d 981 (CA 9, 1994).

 See also American Littoral Society v Environmental Protection Agency, 199 F Supp 2d 217 (D NJ, 2002) (ruling that the plaintiffs had standing to object to the EPA’s failure to establish TMDLs for New Jersey waters); Sierra Club v Browner, 843 F Supp 1304 (D Minn, 1993) (ruling that the plaintiffs had standing to object to the EPA’s failure to establish TMDLs for Minnesota waters).

 I recognize that this Court is not bound by federal caselaw. But specifically because the standing test set forth in Lee and Cleveland Cliffs is derived from federal law, I find federal standing decisions instructive here.

 The majority claims that I do not define “the general public interest.” Ante at 304 n 50. As I think is obvious, “the general public interest” here is preventing the destruction of our environment.

 The majority portrays my position as creating a loophole in standing jurisprudence. It states that I believe that plaintiffs can assert a claim invoking the general public interest even when they do not have standing. This is incorrect. It is only if plaintiffs have standing to challenge the activity at issue that they can assert the general public interest. In this case, plaintiffs have standing to challenge the pumping. Accordingly, they can also invoke the general public interest to challenge all effects of the pumping on the environment.

 By finding that these plaintiffs cannot invoke the general public interest, the majority essentially finds that no plaintiff can invoke the general public interest.

 In support of its claim that the statement from Warth is dictum that need not be followed, the majority cites criticism of Warth by Justices Thomas and Scalia. But unless the majority can show that three other justices share the view of Justices Thomas and Scalia, it has no bearing on the continuing viability of Warth and, frankly, is irrelevant.

 479 Mich 336; 737 NW2d 158 (2007).

 Browner, 20 F3d at 985 (citation omitted).

 Scalia, The doctrine of standing as an essential element of the separation of powers, 17 Suffolk U L R 881, 894 (1983).